**STATE of Tennessee, Appellee,**

v.

**Walter Dale DISHMAN, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Sept. 26, 1995.

---

Joe L. Finley, Jr., Assistant Public Defender, Cookeville, for Appellant.

Charles W. Burson, Attorney General, George P. Linebaugh, Jr., Nashville, David Patterson and Ben Fann, Asst. District Attorneys General, Cookeville, for Appellee.

## OPINION

WADE, Judge.

The defendant, Walter Dale Dishman, was convicted of kidnapping and aggravated rape. The trial court imposed concurrent, Range I sentences of five years for kidnapping and twenty-one years for aggravated rape.

In this appeal, the defendant presents the following two issues for review:

1) whether the trial court erred by admitting hearsay testimony in the form of telephone calls to the police dispatcher; and

2) whether the trial court erred by refusing to allow the defendant to explore the victim's involvement in a burglary.

Because we find that the trial court committed prejudicial error by limiting the defendant's cross-examination of the victim about a prior bad act, we must reverse the conviction and remand this cause for a new trial.

The victim, Diane Dishman, who had been divorced from the defendant for over seven-

teen years, testified that on August 1, 1992, the defendant forcibly took her from her residence and then raped her. The victim admitted that she and the defendant had lived together off and on since their divorce. At the time of the rape, however, the victim had a protective order against the defendant.

At trial, the victim testified that the defendant had not been in her residence for some five to six months before the assault. On the date of the offenses, however, the defendant forced his way into her home, argued with her, and called her "all kinds of dirty names." The victim said that she did not know why the defendant was so upset, but she did detect the smell of alcohol. She stated that the defendant refused to leave, dragged her by the hair to her bedroom, and tried to kiss her. When she refused his advances, the defendant choked her and the victim resisted by striking the defendant. The victim testified that during the fray, the parents of her son's friend pulled into the driveway and blew their car horn. Although the defendant had ordered her to get rid of them, the victim claimed that she went outside and asked the couple to call the police. When the victim started to re-enter her residence, the defendant grabbed her, threw her to the ground, kicked her, and then forced her into his van. The victim testified that the defendant held her by the hair as he drove away.

The victim related that when the defendant stopped, she tried to escape. She said the defendant then pinned her down and removed her shorts and underclothing. She claimed the defendant first attempted anal sex, failed, and then raped her vaginally. The victim testified that the defendant withdrew just before he ejaculated, thereby explaining the absence of semen in her subsequent physical examination. She stated that the defendant cleaned himself with his undershorts and, afterwards, placed the shorts in a "pouch" on the back of a seat in the van.

After the victim got dressed, the defendant threatened "to knock [her] in the f___ing head and take [her] down and throw [her] in that lake." His vehicle stalled as he tried to drive away and when he checked the engine, the victim escaped. She testified that she ran through the Myrtle Avenue area and knocked at several homes, but no one answered. The victim explained that she had not known where she was at first but eventually found her way home, where she left a note for her daughter and drove to a hospital.

It was after midnight by the time the victim arrived at the hospital. Susan Creswell, a licensed practical nurse, took samples for a rape kit analysis. She characterized the victim as upset and angry, described cuts on the victim's feet, and observed bruises on her neck, wrists, arms and back.

Dana Lambert, a Crossville City Police Officer, led the investigation. He described the victim as "visibly upset." Later, the police located the defendant and his van in the Myrtle Avenue area. They found a pair of men's undershorts in a pocket of the van seat.

Raymond Depriest, a serologist with the T.B.I., did not find semen in the vaginal sample taken from the victim. Semen was present, however, on the victim's underclothing. The undershorts taken from the van were not tested.

Lucille Frady testified for the defense. She stated that she had gone to the victim's residence looking for her son on the evening of the rape. She stated that she saw the defendant and the victim standing by a tree out in the yard, but denied that the victim asked her to call the police.

The victim's brother, Lane Parsons, and his girlfriend, Lisa Selby, also testified for the defense. They were driving over to the victim's house when they realized that they were behind the defendant. They saw the defendant pull into the victim's driveway and go to the door of the house. Each testified that the victim permitted the defendant to enter her residence. They saw the victim talking with the defendant inside. They claimed that they blew their car horn for the victim but she did not come out. After several minutes, they left. Parsons, who had previously been convicted of a burglary, admitted that he was a friend to the defendant.

## I

The defendant argues that the trial court allowed inadmissible hearsay testimony on two separate occasions during the course of the trial. First, the defendant complains that the references to the police log entries should not have been admitted under Rule 803(8) of the Tennessee Rules of Evidence. Secondly, the defendant contends that Officer Lambert's testimony qualified as hearsay within hearsay because it was based on statements by the dispatcher who had received the information from one or more unidentified third persons.

The rules of evidence provide that "[h]earsay is not admissible except as provided by these rules or otherwise by law." Tenn. R.Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn.R.Evid. 801(c). Within the hearsay rules of evidence, however, there are, of course, numerous exceptions to the general rule of exclusion. *See* Tenn. R.Evid. 803(1.1) through (25), 804, and 805.

Tenn.R.Evid. 803(8) creates the following exception to the rule against hearsay for public records and reports:

Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, *excluding, however, matters observed by police officers and other law enforcement personnel.*

(Emphasis added). The defendant claims that when the dispatcher was allowed to testify to information contained in her log entries, that this amounted to the improper admission of a police report. The trial court sustained the defendant's objection to the witness testifying to the substance of the calls (the caller said there was a woman in the Myrtle Avenue area seeking help); thus, the logs themselves were not admitted as evidence. The dispatcher was, however, permitted to testify from the records to details therein, such as the time of the call and which officer was dispatched, that she could not otherwise recollect.

The Advisory Commission Comments to Rule 612 suggest guidelines by which a witness may refresh her memory: "The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory." The witness established that the logs would help her refresh her memory of the events to which she was testifying. Here, the witness continued to testify from the police logs. Because they were not taken back, there appears to have been error by the manner in which the log entries were used. We believe, however, any error was clearly harmless in the context of the entire record.

■ Next, the defendant claims that the following, an excerpt from Officer Lambert's testimony, was erroneously admitted because it qualified as hearsay within hearsay:

Q: What type of call did you receive?

A: The Sheriff's Department dispatcher sent the city officers to the vicinity of Myrtle Drive on a report of a woman....

MR. FINLEY: Objection.

MR. PATTERSON: Your Honor, I think it can come in at this point as to why he did what he did.

THE COURT: Overruled.

MR. FINLEY: We are going to do the same thing that we did a little while ago. We are going to have him saying so and so happened, and we don't know that so and so happened by any witness that is here. It is going to be hearsay.

THE COURT: What are you offering, Mr. Patterson? As to why he went out there?

MR. PATTERSON: Yes, sir.

THE COURT: Is it being offered to prove what happened when he got there?

MR. PATTERSON: No, Your Honor. All it is being proved for is to show why he went to this..... What it was that he first understood about the situation.

THE COURT: I overrule the objection.

Q: What was your understanding as to why you were being called there?

A: *Well, like I said, the county dispatcher sent me to the area of Myrtle Avenue on a report of a woman running through the yards.*

MR. FINLEY: Your Honor.....

THE COURT: I have already ruled. You may proceed to your next question.

MR. FINLEY: I am going to have to.... I want to make a motion.

THE COURT: You made your objection and I overruled it. You may proceed.

MR. PATTERSON: What did you do?

A: I responded to the area.

Q: Okay. And what were you doing in that area? What were you looking for?

A: *A woman that was running from yard to yard yelling for help.*

Q: Okay. And what did you do next? I mean, where did you go?

A: *I didn't find any woman running from yard to yard when I went there.*

Q: What was the area that you went to?

A: In the vicinity of Myrtle Drive.

\* \* \* \* \* \*

Q: Did you find what you were looking for out there?

A: No sir. *When I went to Myrtle Avenue, I found no woman running from yard to yard.*

(Emphasis added). Tennessee Rule of Evidence 805 states that "[h]earsay within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules or otherwise by law." The state argues that the trial court did not err by admitting the content of these calls for the limited purpose of explaining why the officer did what he did.

In *State v. James McCue*, No. 138, slip op. at 3–4, 1991 WL 170689 (Tenn.Crim.App., at Knoxville, Sept. 6, 1991), this court ruled in similar circumstances that "[b]ecause the report was introduced to establish its effect on the trooper, that is, to provide a reason for his making the investigation, it may not have been hearsay at all." (Citing N. Cohen, D. Paine, and S. Sheppeard, *Tennessee Law of Evidence* § 801.6 (2d ed. 1990)). The *McCue* panel also observed that prior opinions had

"characterized such testimony as 'minor infractions' of the rule against hearsay rendered innocuous by an instruction to the jury not to consider the evidence for any purpose." *State v. McCue,* slip op. at 3–4; *see also Crawford v. State,* 4 Tenn.Crim.App. 142, 469 S.W.2d 524 (1971).

The state's position is that the evidence was admitted for the limited purpose of explaining why the officer initiated the investigation. Had the state not elicited essentially the same response through four different questions during the course of Officer Lambert's testimony, we may have accepted the accuracy of that explanation. Certainly, by the use of a *McCue* instruction and with less focus on the content of the call, any error could have been either avoided or rendered altogether harmless. Because there was no such instruction, the procedure used was probably error. *See State v. Dutton,* 896 S.W.2d 114, 116 (Tenn.1995) (the trial court should provide limiting instructions when the evidence is offered for a limited use). In the context of the entire record, however, any error was clearly harmless in this instance because, at best, the evidence merely corroborated a fairly insignificant portion of the victim's testimony; that is, she may have been the woman seen by the caller in the Myrtle Avenue area. That the officer was unable to find any such person in the Myrtle Avenue area tended to negate the value of the evidence for the state.

II

■ Next, the defendant argues that he should have been allowed to question the victim about her involvement in a burglary. She referred to the defendant having been in jail for the unrelated offense just prior to these charges.

■ Initially, we point out that the defendant has failed to cite specific authority to support his claim. Where the defendant omits references to legal precedent, an issue may be deemed waived. Tenn.R.App.P. 27(a); Tenn.R.Crim.P. 10(b); *State v. Chance,* 778 S.W.2d 457, 462 (Tenn.Crim. App.1989). There are good reasons for the rule and the performance of counsel may be

deficient when an objection or argument has been neglected. Nonetheless, cross-examination is a fundamental right. *E.g., State v. Hill,* 598 S.W.2d 815 (Tenn.Crim.App.1980). There are many reported cases on the subject. Thus, we have chosen to address the merits of the defendant's assertions.

■■■ The gravamen of the complaint is that the trial court improperly limited defense counsel's attempt to impeach the credibility of the victim and her testimony. Generally speaking, a denial of the right to an effective cross-examination is "constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial." *State v. Hill,* 598 S.W.2d at 819. The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court. *Coffee v. State,* 188 Tenn. 1, 4, 216 S.W.2d 702, 703 (1948); *Davis v. State,* 186 Tenn. 545, 212 S.W.2d 374, 375 (1948). Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right. *State v. Fowler,* 213 Tenn. 239, 253, 373 S.W.2d 460, 466 (1963); *State v. Johnson,* 670 S.W.2d 634, 636 (Tenn. Crim.App.1984).

■■■ Here, the defendant attempted to introduce a prior bad act on the part of the victim, involvement in a burglary, as a means of impeachment. The trial court excluded the evidence because the victim had been granted pretrial diversion, had successfully completed the program, and had thereby avoided the possibility of trial and conviction. The mere fact that there was no conviction, however, is not a sufficient basis for exclusion. Tennessee Rule of Evidence 608(b) allows the admission of specific instances of conduct under certain circumstances. The rule provides, in part, as follows:

Specific Instances of Conduct.—Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

(2) The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under this paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs its prejudicial effect[.]

Tenn.R.Evid. 608(b)(1) & (2). This rule authorizes proof of a prior bad act which is relevant to a person's character for truthfulness or untruthfulness. Crimes involving dishonesty have generally been admissible to impeach a witness's credibility; burglary is such an offense. *Jenkins v. State,* 509 S.W.2d 240, 246 (Tenn.Crim.App.1974); *see also* Tenn.R.Evid. 609 (dealing with admission of prior convictions for impeachment purposes).

■■■ Prior convictions are governed by Rule 609. Here, there was no conviction, even though the victim admitted in the jury-out hearing that she had participated in the burglary. While the charges were ultimately dismissed under the terms of the diversion statute, a dismissal does not necessarily preclude the use of this prior misconduct as a means to impeach. *See* Tenn.R.Evid. 608(b).

■■■ In *State v. Williams,* 645 S.W.2d 258, 260 (Tenn.Crim.App.1982), this court held that "the diversion act cannot be used to

shield a witness from an attack upon their credibility when they are asked about prior bad acts." The *Williams* court held that "[t]o do otherwise would deny the accused the right to a fair trial [and t]he constitutional right to confrontation of witnesses is denied unless the right to cross-examine witnesses is afforded." *Id.; see also Kanipes v. North American Phillips Electronics Corp.,* 825 S.W.2d 426, 428–29 (Tenn.Ct.App.1991) (civil case allowing evidence under Tenn. R.Evid. 608 of prior bad act from another state of a case similar to a pretrial diversion case). Although the decision in *Williams* was a pre-rules decision, we believe the importance of cross-examination warrants the continued application of its holding. The rules of evidence do not bar the defendant's use of the prior bad act to impeach the victim's testimony so long as the probative value on credibility outweighs any unfair prejudice. *See* Tenn.R.Evid. 608.

■ We also believe that our statutes would not bar the admission of testimony about this prior bad act. *Cf. Pizzillo v. Pizzillo,* 884 S.W.2d 749 (Tenn.Ct.App.1994).[1] In our view, neither the diversion statutes nor the expungement statutes prohibit questioning a witness about prior bad acts. There is no indication in the record as to whether the victim's records of the prior burglary proceedings were expunged. Even if they were, however, this would not preclude the defendant from cross-examining the victim about her misconduct. Our general expungement statutes are limited to "public records." Tenn.Code Ann. § 40–32–101. In addition, the expungement language contained in our judicial diversion statute precludes testimony only of any "arrest, or indictment or information, or trial." Tenn. Code Ann. § 40–35–313(b). The statute specifically permits a successful participant in the diversion program to be in "the status he occupied before such arrest or indictment or information." *Id.* This does not alter the fact that the victim may be guilty of a prior

bad act. Under both the rules and the statutes, the defendant must be permitted to cross-examine the witness about any probative, prior bad act. As we view the terms of the diversion statutes, they preclude reference to any criminal proceedings incident to the process, but do not prohibit questions about the underlying misconduct.

Here, the prior act of burglary was an act of dishonesty. In our view, it bore directly upon the credibility of the victim. In addition, the prior act involved both the defendant, who served a term in jail for the offense, and the victim, who made reference to his incarceration during the course of her testimony. Under these circumstances, it is our opinion that the balancing test would have clearly weighed in favor of the admission of the evidence. Thus, the trial court erred by excluding it.

■ Having found that there was error, we now turn to the question of whether the error "more probably than not affected the judgment," thereby depriving the defendant of his right to a fair trial. Tenn.R.App.Proc. 36(b). We think it did. There was conflicting testimony about the defendant's demeanor when he arrived at the victim's residence. As indicated, the convictions for kidnapping and rape depended almost entirely upon the truthfulness of the victim's testimony, much of which was uncorroborated. Because the credibility of the victim was a central issue, the victim's previous participation in a crime involving dishonesty was especially probative. The evidence, if admitted, may have changed the results of the trial. The importance of a full and complete cross-examination, under these circumstances, is so fundamental as to preclude a finding of harmless error.

TIPTON, J., and ROBERT E. BURCH, Special Judge, concur.

---

1. In this civil case, the court held that a memorandum of understanding entered into under our pretrial diversion statute could not later be used in a civil custody hearing. The court held that while the pretrial diversion act only restricted the use of this document in "criminal trials involving the same charge," the expungement statutes prohibited the use of the document to contradict the witness' denial of the acts previously charged. The court stressed the fact that this limitation was on the public records of the prior proceeding. *Pizzillo,* 884 S.W.2d at 753–55.