IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 26, 2002 Session

**STATE OF TENNESSEE v. LAVAYA DEMOND LEE**

**Appeal from the Criminal Court for Hamilton County**
**Nos. 220674 & 220676     Douglas A. Meyer, Judge**

---

**No. E2001-00053-CCA-R3-CD**
**August 5, 2002**

---

The defendant, Lavaya Demond Lee, appeals from his jury convictions of premeditated first-degree murder, first-degree felony murder, and especially aggravated robbery in the Hamilton County Circuit Court. He received a life sentence for the merged murder conviction and a consecutive 20-year sentence for especially aggravated robbery. On appeal, he complains of evidentiary errors, jury-instruction errors, and error in imposing consecutive sentences. We affirm the convictions; however, we vacate the order imposing consecutive sentencing and impose the 20-year sentence to run concurrently with the life sentence.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed in Part, Reversed in Part.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

John Allen Brooks, Chattanooga, Tennessee, for the Appellant, Lavaya Demond Lee.

Paul G. Summers, Attorney General & Reporter; Mark A. Fulks, Assistant Attorney General; William H. Cox, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

Roy M. Hunter was shot and killed outside his Chattanooga business establishment on the evening of December 9, 1997. Mr. Hunter's business, Hunter Transport Company, was located on Long Street, across from a social establishment variously known as Long Street Confectionery or Skeezer's Lounge. Earlier that day, Mr. Hunter had delivered a trailer to Newport, Tennessee, and he returned sometime between 10:30 p.m. and 11:00 p.m. He parked his tractor cab on the street, unlocked the business gate, and was heading for the office door when he was robbed and shot twice. The murder weapon was never recovered, and there were no eyewitnesses to the actual robbery and shooting.

A police investigation led to the arrest of the defendant and his cousin, Mark Caldwell. The two men, along with Christy Ash and Claudette Richmond, had been at Skeezer's Lounge the night of the shooting. The defendant and Caldwell were charged with premeditated, first-degree murder, felony murder, and especially aggravated robbery; their cases were severed, and the charges against the defendant were tried first. The proof at trial, viewed in the light most favorable to the state, established the following.

Chattanooga Police Detective William Neblette was the lead homicide investigator assigned to the shooting. He testified that he arrived at the scene on Long Street at 11:24 p.m. Two other officers had already secured the area. Detective Neblette viewed the victim's body, which was located between a van parked in the driveway of the business and a pile of tire parts. He stated that a wallet and a set of keys were on the ground close to the victim's body. The victim's brother, Thomas Hunter, testified that his brother typically carried a wallet in his left rear pocket, which he kept buttoned, and that his brother carried his keys in his right front pocket. According to the brother, approximately two days before the shooting the victim had cashed a company check for $1,400 to cover truck expenses.

At trial, Dr. Frank King, the Hamilton County Medical Examiner, testified and confirmed that the victim died of multiple gunshot wounds. Dr. King stated that the victim was shot twice. One bullet entered the left side of the victim's face and proceeded through the jaw, downward through the neck, and into the right chest. A second bullet entered the victim's left front hip, passed through a main artery, and exited the victim's left buttock. Dr. King characterized the gunshot wound to the face as a "distant gunshot wound," meaning that the end of the gun was two feet or more from the body when discharged. By contrast, in Dr. King's opinion, the gun barrel was in contact with the body at the time the victim was shot in the hip. The state's theory was that the downward trajectory of the bullet that entered the victim's face and came to rest in his right chest was consistent with the victim first being shot in the hip, falling to the ground, and last being shot in the face. In addition, because the victim's wallet was not bloodied or otherwise damaged, the state's theory was that the wallet had been removed from the victim's left rear pocket before the first shot was ever fired; otherwise, the shot to the left front hip that exited the victim's left buttock would have passed through the wallet.

As part of Detective Neblette's investigation, he interviewed three individuals the evening of the shooting. Ossie Poke had been working that evening at his automobile repair shop located one and one- half blocks from Skeezer's Lounge. Mr. Poke told Detective Neblette that he heard two gun shots at approximately 9:30 p.m. Mr. Poke did not investigate at the time, but when he closed up his shop he walked toward the lounge and saw the police. Detective Neblette interviewed and took a recorded statement from Albert Sorrells that evening and another statement the following evening. The third person interviewed was Jesse Deloach, the manager of Skeezer's Lounge. Detective Neblette stated that Mr. Deloach was the person who called and reported the shooting to the police.

At trial, Detective Neblette related that he first encountered Mark Caldwell the evening following the shooting. Another officer had received a call advising that a person who had been at the lounge the evening that the victim was shot had returned to the lounge. Detective Neblette drove to Skeezer's Lounge, and he testified that he stopped Caldwell and talked to him. Caldwell consented to a search of his vehicle and allowed the police to photograph him. Caldwell was not arrested at that time.

Detective Neblette testified that his first contact with Christy Ash, Caldwell's sister, was on January 15, as a result of an informant's tip. Detective Neblette and another officer went to Ash's apartment. Ash answered the door, but she falsely identified herself as "Belinda." She told Detective Neblette that Ash was not home. As they talked, Detective Neblette spied Caldwell walking through the apartment. Detective Neblette called out to Caldwell. Caldwell came to the door, and Detective Neblette told him that he wanted to talk with Caldwell's sister. During the course of the conversation, Detective Neblette also asked about Caldwell's cousin Claudette.

Based on partially correct information from Caldwell and "Belinda," Detective Neblette located Claudette Richmond and interviewed her on January 16. That same afternoon, the police found Ash, and Detective Neblette interviewed her about 2:00 p.m. Detective Neblette testified that after talking with the two women, he ordered the arrest of Caldwell and the defendant.

Following the defendant's arrest, he made inculpatory statements that the state introduced at trial. Officer Steve Coleman had been directed to transport the defendant to the jail. Officer Coleman testified that as he was escorting the defendant toward the jail doors, the defendant told him that "he robbed the man but he didn't kill anybody." Similarly, the defendant spoke to Detective Gary Blair following the preliminary hearing on the homicide and robbery charges. Detective Blair was assigned to the General Sessions Court, and he escorted prisoners in and out of the courtroom. Detective Blair testified that when he was taking the defendant to the holding cell area of the courtroom, the defendant told him that "he had done the crime, but the detective had told some lies."

Caldwell, who was awaiting trial, did not testify in this case. The state did, however, call Ash and Richmond. Both women were evasive and uncooperative.[1] The first to testify was 23 year-old Christy Ash. She explained that Caldwell is her brother and that the defendant and Richmond are her cousins. Ash testified that on the day of the shooting the defendant, Richmond, and Caldwell came to her apartment. The group decided to go to Skeezer's Lounge, and they rode in Caldwell's vehicle. Ash claimed not to remember who drove. She did, however, finally admit that she saw a gun in the car. The gun belonged to her brother, Caldwell. As for finances, Ash testified that she had approximately $20 with her that evening and that she could not recall anyone else in the group having money.

---

[1] The defense did not fare much better than the state did with Ash and Richmond. Both women had rebuffed defense efforts to interview them pretrial.

According to Ash, once the group got to Skeezer's, they went inside. She and Richmond played cards and drank. Ash testified that Caldwell and the defendant went outside periodically to smoke. Ash said that, after a time, Caldwell came back inside and told the women that "it was time to go."

Ash, Caldwell, and Richmond left the lounge, and as they were getting into Caldwell's car, Ash said that the defendant came walking from behind the car and got into the rear passenger seat. She further testified that the defendant had a gun with him that he placed in the floorboard. Ash related that when she and Richmond questioned the defendant about what had happened, he replied, "Nothing, don't worry about it." At the preliminary hearing, Ash had testified that the defendant also remarked, "I hope I didn't kill him." At trial, Ash initially insisted that she did not remember testifying that way, but after hearing a portion of the taped hearing and after being warned by the trial court about the penalties for perjury, Ash affirmed that at the preliminary hearing she had so quoted the defendant. In a similarly reluctant fashion, Ash conceded that when she was interviewed by the police, she told them that while the defendant was in the car, he also said that he "would take the rap" and that he would "tell them [he] did everything."

Ash testified that after they left Skeezer's, they drove to Krystal to buy something to eat and then proceeded to her apartment. In route to the apartment, Ash stated that the defendant asked Caldwell to buy him some "powder, cocaine." The group, however, proceeded to the apartment, and once there Ash told the defendant not to bring the gun inside the apartment. Ash's boyfriend, Marcus Heard, was at the apartment, and he and Caldwell left sometime later to purchase marijuana. The defendant did not accompany Heard and Caldwell, who returned about fifteen minutes later. Ash testified that the defendant was quite drunk and that he went to sleep soon after arriving at the apartment. The others stayed up, played cards, and smoked the marijuana.

Claudette Richmond, who was 24 years old at the time, testified that the defendant and Caldwell picked her up in North Chattanooga earlier on the day of the shooting. They drove to Ash's apartment, and from there Richmond drove Caldwell's vehicle to Skeezer's Lounge. Richmond recalled that during the drive, she passed a gun to Caldwell, who was sitting in the back seat.

Richmond's memory of what took place at Skeezer's Lounge was sketchy. She testified that she drank and played cards. Caldwell came in and spoke to Ash saying, "Let's go." In her statement to the police, Richmond described Caldwell as "rushing" inside the lounge. After reviewing her statement, Richmond agreed that Caldwell was in a hurry to leave.

Richmond initially testified that when they left the lounge, the defendant was with them. She said, "All of us got in the car." Richmond's statement to the police and her preliminary hearing testimony were inconsistent with that account. The trial court advised Richmond, as it had with Ash, about the penalties for perjury, after which she admitted that the defendant was not with them when they left the lounge and was not at the car when they got to it. Richmond testified that Caldwell got into the driver's seat, Ash took the backseat behind Caldwell, and Richmond sat in the

front with Caldwell. When the defendant arrived and got into the backseat, Richmond stated that she told him not to sit on her coat. The defendant moved the coat and sat down. Richmond testified that she did not see a gun at that time.

After they returned to Ash's apartment, Richmond testified that Caldwell produced some money and divided it four ways. Richmond got some of the money; she was uncertain of the amount but thought it was "over a hundred dollars." The defendant was asleep at that time, and Richmond did not see him take any of the money. She also claimed to be unsure if Ash took any money.

The defendant testified in his own defense and presented two witnesses at trial. The 24 year-old defendant admitted receiving some of the robbery proceeds but denied being present when the victim was shot and denied being otherwise involved in the shooting or the robbery.

According to the defendant, he began the day of the shooting by picking up Richmond and going to Ash's apartment. "We all sat around," the defendant related, "had a couple of drinks, smoked some marijuana, and we decided to go down to the lounge." Earlier that day, the defendant had seen a gun in Caldwell's car under the floor mat of the driver's seat. When the group left to drive to Skeezer's, the defendant saw Richmond hand the gun to Caldwell.

At the lounge, the defendant sat with Ash and Richmond until the women moved to the back of the lounge to play cards. Then the defendant sat alone and drank while Caldwell "mingl[ed] around." The defendant stated that he went outside once to get fresh air because he was hot and drunk. He had told Caldwell that he was ready to leave because he was drunk, but Caldwell wanted to stay. Therefore, the defendant testified, he went to the car, lay down in the back seat, and went to sleep. He woke up when the first gunshot was fired, and the second gunshot prompted him to get out of the vehicle at which time he saw Caldwell running toward him. The defendant said that Caldwell told him to get back into the car, but the defendant refused because he wanted to see what was happening. The defendant estimated that there were 15 to 20 people in the street; he did not see the victim.

The defendant testified that he stood outside the car for five to ten minutes. The other members of his group got into the vehicle, and when the defendant began to get in, Richmond told him not to sit on her coat. Richmond reached back and moved her coat, at which time the defendant stated that he saw a pistol on the back seat. The defendant said that he knocked the pistol into the floorboard. On cross examination, the defendant could not explain how or when Caldwell retrieved the gun from the car or how or when Caldwell replaced the gun inside the car and under Richmond's coat.

The defendant testified that after leaving the lounge, the group stopped at Krystal. The defendant ordered food, and Caldwell paid for it. Thereafter, they drove to Ash's apartment. The defendant testified that the last thing he remembered was going to Ash's apartment. When he woke in the morning, Caldwell gave him "a hundred and something odd dollars." The defendant

said that he realized the source of the money later in the day when he saw "the news flash" on television. He, nevertheless, kept the money because he was "just thinking how high [he] can get off of this money." The defendant did not contact the police about the shooting because he did not want to implicate his cousin. Approximately one week later, the defendant, Caldwell, and Ash traveled to Atlanta where they spent robbery money on lodging, food, and clothing.

The defendant testified that when he was arrested on January 16, he gave an untruthful statement to the police. He claimed that his motivation was to hide Caldwell's involvement in the shooting. The defendant agreed that as he was being taken to jail, he made a statement to the transporting officer. The defendant testified that he said, "I did not kill Mr. Hunter but I took in [sic] some of the money." The next day, the defendant tried to commit suicide while in custody. The defendant also spoke to the court officer at his preliminary hearing. The defendant testified that what he actually said to the officer was, "If you man enough to do the crime, you gotta be man enough to do the time," but he added that he "was not man enough to do the time for someone else's crime."

The defendant concluded his testimony by confessing that he took part of the robbery money. He insisted, however, that he did not plan with Caldwell to rob Mr. Hunter and that he did not shoot Mr. Hunter.

Albert Sorrells claimed that he was present at Skeezer's Lounge the evening of the shooting. At the time Sorrells testified for the defense, he was serving an incarcerative sentence for violation of Georgia's controlled substance act, and his criminal record included convictions for grand larceny, receiving stolen property, and robbery. Sorrells stated that he was outside the lounge when Mr. Hunter drove up, parked, and headed for his office. Sorrells testified that he saw two men whom he knew walk up to the victim, whereupon a confrontation ensued. Sorrells did not see the actual shooting, but he heard gunshots and watched the two men run back into the lounge. Sorrells testified that the defendant was not one of those men. From a photograph, Sorrells identified Caldwell as one of the assailants, and the other assailant was a man named Black.

Sorrells spoke with Detective Neblette later that evening and again a few days later. Sorrells initially told Neblette that he was inside Skeezer's and did not see what happened. Sorrells testified on cross-examination that he lied to Detective Neblette because he did not feel comfortable talking with him but that he told Officer Newsome what actually happened. Sorrells spoke with Detective Neblette a second time in the presence of Officer Newsome. Even in that statement, however, Sorrells never mentioned two individuals; he told the officers that he saw only one person cross the street and that person was named Black. On cross examination, Sorrells claimed that he meant that Black and Caldwell were together and that Black shot Mr. Hunter. Sorrells had testified previously that he did not see the actual shooting, and when the state pointed out that inconsistency, Sorrells said that when Black was running away after the shooting, Black had the gun in his hand. The state also asked Sorrells about the defendant's presence at Skeezer's Lounge. Sorrells claimed that the defendant was not with Caldwell and, indeed, was not at the lounge at all that night.

The defense called Nakia Grasty, who knew Caldwell, had shared a jail cell with Caldwell, and had talked with Caldwell about the shooting. At the time Grasty testified at trial, he was incarcerated in the Hamilton County Jail. Grasty had prior convictions for multiple thefts and aggravated burglary.

Grasty testified that while he and Caldwell were in the same cell, Caldwell began asking questions about different types of guns. The conversation eventually led to Caldwell discussing the shooting. Caldwell's account of the shooting, as related to Grasty, was somewhat muddled. Caldwell told Grasty that the victim, "dude," had robbed him and that the defendant proposed that he and Caldwell retrieve the money. When they went to get the money, "dude" laughed at Caldwell. Caldwell, who did not find the situation amusing, coincidently had the hammer cocked on his gun and accidentally shot "dude."

After the defense rested, the state recalled Detective Neblette. He testified about his investigative efforts to locate the person who Sorrells had identified as "Black." Based upon a description provided by Sorrells, Detective Neblette created several photographic lineups of individuals with the nickname "Black." Detective Neblette included a photograph of Caldwell in one of the lineups. Sorrells did not pick out Caldwell as one of the individuals he claimed to have seen; moreover, the individual Sorrells did select from the lineup had been incarcerated in Atlanta at the time of the shooting.

The jury deliberated, and based upon the proof it found the defendant guilty of premeditated first-degree murder, felony murder, and especially aggravated robbery. Because the state was seeking a sentence of life without the possibility of parole for the homicide convictions, a separate penalty-phase trial ensued. The jury rejected the single statutory aggravating circumstance advanced by the state that the victim was killed to interfere with his ability to act as a witness against the defendant, *see* Tenn. Code Ann. § 39-13-204(i)(6) (Supp. 2001); consequently, the defendant's punishment was fixed at imprisonment for life with the possibility of parole.

At a separate sentencing hearing on the especially aggravated robbery conviction, the trial court sentenced the defendant to 20 years' confinement in the Department of Correction to be served consecutively to the jury-imposed life sentence.

On appeal, the defendant complains of two evidentiary errors, jury-instruction deficiencies, and the dangerous offender-based consecutive sentencing. He does not challenge the legal sufficiency of the convicting evidence.

**I**

We will first address the defendant's contention that he is entitled to a new trial because of prejudicial rulings by the trial court (1) that restricted his ability to cross-examine Christy Ash about hearsay remarks made by another patron of Skeezer's Lounge and (2) that permitted the state to cross-examine Claudette Richmond as a hostile witness. We review the trial court's

evidentiary rulings and any limitations on cross-examination for abuse of discretion. *See State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Finding no abuse of discretion or unreasonable restrictions, we affirm the trial court's rulings.

During Ash's cross-examination, the defense sought to elicit that a female named Boobie came into the lounge, went over to Ash, and told Ash that her brother, Caldwell, was outside shooting a gun up in the air. The trial court sustained the state's hearsay objection to introduction of Boobie's statement. At trial, the defendant argued for admissibility on the basis that the statement constituted a warning, and on appeal, the defendant urges that the statement qualifies as an excited utterance pursuant to Tennessee Rule of Evidence 803(2).

The state insists that the defendant has waived this issue because a party is not allowed to take one position in the trial court (it is a warning) and later advocate a different ground or reason on appeal (it is an excited utterance). *See State v. Aucoin*, 756 S.W.2d 705, 715 (Tenn. Crim. App. 1988). Although we agree that a defendant is not at liberty to meander along the stream of hearsay exceptions in search of a safe ford, we do not believe that the defendant has done so in this case. Previously, this court has analyzed the admissibility of a hearsay "warning" as an "excited utterance." *State v. Earl T. Jefferson*, No. W2000-00608-CCA-R3-CD, slip op. at 4-5 (Tenn. Crim. App., Jackson, Jun. 12, 2001) (defendant's cousin warned a witness not to "stick [her] head out the door about 10:30," because they were "going to come back through spraying"; no testimony concerning cousin's demeanor when she delivered the warning such that state failed to establish proper foundation for excited utterance).

The state also insists that even if the issue is not waived, Boobie's statement does not qualify as an "excited utterance." On this point, we agree. Evidence Rule 803(2) carves out an excited utterance exception to the hearsay rule. An excited utterance is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). The following foundational requirements must be proven before this hearsay exception applies. First, a startling event or condition must be the catalyst for the stress of excitement; second, there must be a nexus between the statement and the startling event; third, the utterance must be forthcoming while the declarant is under the stress of excitement from the event or condition. *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997).

None of these foundational requirements was met in this case. The defendant did not make an offer of proof of the circumstances attending the statement. All that is before us in the record is defense counsel's explanation to the trial court at a bench conference that "[Ash] gave a statement to the police that this woman came in and told her her brother was outside shooting a gun up in the air." Accordingly, we hold that it was not error for the trial court in this case to limit the scope of cross-examination of Ash regarding statements made by another patron.

As for the trial court permitting the state to treat Claudette Richmond as a hostile witness, the defendant seems to be arguing that the state failed to move to have Richmond so declared and that the state did not demonstrate that it was "surprised" by her testimony. Initially,

we point out that the defendant has failed to cite any authority to support his claim, and we are aware of none. When a defendant omits references to legal precedent, an issue may be deemed waived. Tenn. R. Ct. Crim. App. 10(b); *State v. Chance*, 778 S.W.2d 457, 462 (Tenn. Crim. App. 1989).

At any rate, the mode and order of witness interrogation and presentation of evidence are matters entrusted to the trial court's sound discretion, including the decision whether to allow a party to examine a witness by leading questions. "When a party calls a witness determined by the court to be a hostile witness, interrogation may be by leading questions." Tenn. R. Evid. 611(c); *see Wilkerson v. Altizer*, 845 S.W.2d 744, 746-47 (Tenn. Ct. App. 1992). In the present case, the trial court's determination that Richmond was hostile is supported by the record and is not an abuse of discretion. Richmond was evasive, reluctant, and uncooperative – hallmark signs of a hostile witness. Examination by leading questions was proper and altogether reasonable in this case.

## II

The defendant in this case was charged in separate counts with premeditated first-degree murder and first-degree murder in the perpetration of a felony. As related to premeditated first-degree murder, the trial court instructed the jury on the lesser-included offenses of second-degree murder and voluntary manslaughter. As related to the felony-murder charge, the trial court instructed the jury on the lesser-included offense of facilitation of first-degree murder and the non-included offense of accessory after the fact to first-degree murder.[2] The jury convicted the defendant of both premeditated murder and felony murder, which were then merged into a single conviction for first-degree murder.

The defendant argues that the trial court prejudicially failed to instruct the jury on all applicable lesser-included offenses to first-degree murder in the perpetration of a felony. He reads our case law as holding that reversible error automatically occurs when both premeditated and felony murder are charged but the instruction given on lesser-included offenses covers only the premeditated murder charge.[3] The state concedes that the instructions were deficient but insists that no relief should be forthcoming because the premeditated murder conviction is unaffected by the error and independently supports the judgment.

The defendant did not raise the issue in his motion for a new trial. Tennessee Rule of Appellate Procedure 3(e) is specific that in all jury cases, "no issue presented for review shall be

---

[2]The trial court should not have instructed the jury that accessory after the fact to the murder was a lesser-included offense. *State v. Jon Robert Goodale*, No. M2000-02140-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Nashville, Sept. 14, 2001).

[3] The opinion to which the defendant cites for this proposition was designated "Not for Citation," when permission to appeal was denied by the supreme court. *See* Tenn. R. Sup. Ct. 4(F)(1), (2). Furthermore, the jury in that case did not convict on premeditated first-degree murder; it convicted on the lesser-included offense of reckless homicide. The jury also convicted on a separate felony-murder count.

predicated upon . . . jury instructions granted or refused . . . or other action committed or occurring during the trial . . . unless the same was specifically stated in a motion for a new trial." Tenn. R. App. P. 3(e). "[O]therwise," the rule concludes, "such issues will be treated as waived." *Id*. Because the defendant failed to include the issue in his motion for new trial, he has waived the issue on appeal. *See State v. Spadafina*, 952 S.W. 444, 451 (Tenn. Crim. App. 1996).

Nor does plain error avail the defendant. Criminal Procedure Rule 52(a) states that "an error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." Tenn. R. Crim. P. 52(a). Whatever may be said about the felony-murder conviction in this case, the evidence was legally sufficient to support a finding that the shooting of the victim was premeditated, which defeats any claim that an injustice exists requiring correction on appeal.

## III

During its deliberations, the jury inquired of the trial court: "If two people commit a crime where someone is murdered and only one person commits the actual murder, are both parties equally guilty for the murder under the law and subject to the same punishment?"

The trial court brought the jury in and responded as follows: "The Court's response is yes. Under the felony murder count, if two people commit a robbery, both parties are equally guilty for a murder committed in perpetration of the robbery." The trial court added, "So you can retire and add that with your other charge and continue your deliberations." The defendant never objected to this supplemental instruction, and it was not registered as a ground in his new trial motion.

Now, on appeal the defendant argues in a conclusory fashion that the supplemental instruction was confusing and that it was not reduced to writing. The defendant's complaints are untimely, and our review has been waived. *See* Tenn. R. App. P. 3(e), 36(a); *State v. Hall*, 8 S.W.3d 593, 603 (Tenn. 1999). Our independent review, moreover, convinces us that the instruction was not confounding. As for whether the supplemental instruction needed to be reduced to writing, we are stymied because *none* of the trial court's written instructions are included in the record; therefore, we cannot determine, in the first instance, whether the supplemental instruction was reduced to writing. Our review thus impeded, we will not disturb the trial court's actions.

## IV

Last, the defendant complains about the imposition of consecutive sentencing for his convictions. The thrust of the defendant's argument appears to be that in classifying the defendant as a "dangerous offender," the trial court failed to make findings relative to the need to protect the public against further criminal conduct and to the aggregate sentence being reasonably related to the severity of the crimes.

When a defendant is convicted of one or more offenses, the trial court must determine if the sentences shall be served concurrently or consecutively. Tenn. Code Ann. § 40-35-115 (1997). Consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more of the following criteria exist:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist . . .;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . .;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

*Id*. § 40-35-115(b)(1)-(7) (1997). In addition to these criteria, consecutive sentencing is subject to the general sentencing principles providing that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." *Id*. §§ 40-35-102(1), -103(2) (1997); *see State v. Imfeld*, 70 S.W.3d 689, 708 (Tenn. 2002). Moreover, in *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995), the supreme court articulated two additional requirements for consecutive sentencing under the dangerous offender category; the trial court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. *See id.* 70 S.W.3d at 708 (need for the additional *Wilkerson* findings arises in part because "dangerous offender" category "is the most subjective and hardest to apply").

At the conclusion of the sentencing hearing in this case, the trial court ordered that the defendant's especially aggravated robbery sentence be served consecutively to his life sentence. The trial court's findings appear in the record as follows:

> I do find, under consecutive sentencing, number 4, that he is a dangerous offender, because they had his billfold. If they were there just to rob him, there was no need for them to execute him, so he did indicate little or no regard for human life, so I will make that a consecutive 20-year sentence to the life sentence that the jury imposed on the first degree murder.

We cannot extend to these meager remarks the presumption of a correct sentence. *See State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000) (presumption applies when trial court follows statutory sentencing procedure, gives due consideration and proper weight to the factors and principles set out under the sentencing law, and articulates findings that are adequately supported by the record); *State v. Ashby*, 823 S.W.2d 155, 169 (Tenn. 1991) ("[T]he presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."). Accordingly, our review will proceed *de novo* without a presumption of correctness.

The defendant does not have a particularly lengthy or escalating criminal history. The convictions that appear in the presentence report are for misdemeanor offenses, such as driving with a suspended license, operating a vehicle without registration, disorderly conduct, assault, and criminal trespass. The presentence report does reference a juvenile petition involving carrying a gun on school property, but the noted disposition is 50 hours of community service; no other information is reflected.

The trial court relied exclusively on the "needless" shooting of the victim as demonstrating little or no regard for human life. This consideration is certainly pertinent and supported by the evidence that considering the pristine condition of the wallet when found by the police, it obviously had been removed from the victim's left rear pocket before he was shot through the left hip. Even, however, with evidence that an offender's actions demonstrated little or no regard for human life, consecutive sentencing does not automatically follow. *See Imfeld*, 70 S.W.3d at 708 (proof of little or no regard for human life shows that defendant is dangerous offender, "but it may not be sufficient to sustain consecutive sentences"). To conclude otherwise contravenes *Wilkerson*'s view of sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules." *Wilkerson*, 905 S.W.2d at 938. We, therefore, reject the notion that consecutive sentencing is always appropriate whenever a death occurs during the course of a robbery.

We believe that the person who shot the victim after robbing him evinced a quality of dangerousness that could warrant consecutive sentencing. Our concern with the proof in the present case, however, is the uncertainty about whether the defendant was this person. To be sure, his culpability for the homicide is supplied, at least, by the theory of complicity, but while being responsible for the crime of another, on the one hand, renders the accused guilty of the crime, on the other hand it does not *per se* supply the elements for consecutive sentencing.

Had the trial court affirmatively found as a fact that the defendant shot the victim after robbing him, we might well have deferred to the finding because there is a basis in the record via the defendant's statements to support the finding.[4] In ruling on the consecutive issue, however, the trial court said the victim was shot after "*they* had his billfold" and that "there was no *need* for *them* to execute him." (Emphasis added.) The comments suggest that the lower court made no finding that the defendant actually shot the victim.

Furthermore, both the trial judge and the jury declined to apply more severe consequences to the defendant's conduct when they could have done so by ascribing a more egregious culpability to him. In other words, we note that the trial court refused to enhance the length of the defendant's sentence based on enhancement factor (5) that the defendant "treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense." *See* Tenn. Code Ann. § 40-35-114(5) (Supp. 2001). Also, the trial court applied as a mitigating sentencing factor that the defendant appeared somewhat remorseful and that he was "suffering from some mental condition." According to clinical psychologist David Solovey, who testified at the sentencing phase of the first-degree murder prosecution, the defendant suffers from several emotional disturbances, which led to two suicide attempts before his arrest in this case and one further suicide attempt after he was jailed on the homicide charge. Finally, we note that in the sentencing phase of the murder trial, the jury rejected the state's contention that life without the possibility of parole was an appropriate sentence based upon the statutory aggravating circumstance that the murder was committed to prevent the defendant from being arrested or prosecuted. *See* Tenn. Code Ann. § 39-13-304(i)(6) (Supp. 2001) (the "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another").

In making our *de novo* review from the standpoint of the relevant sentencing principles and guidelines, and given a lack of finding that the defendant personally shot the victim, coupled with his lack of a violent criminal record, we are simply not persuaded that protecting the public against further criminal conduct by the defendant requires service of a 20-year sentence consecutively to a sentence of life with the possibility of parole.

For all the foregoing reasons, we affirm the defendant's convictions but reverse the imposition of consecutive sentencing. Upon remand, the especially aggravated robbery judgment shall be modified to reflect that service of the 20-year sentence is concurrent with the first-degree murder sentence.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[4]Some the defendant's pretrial statements also indicate that he did not shoot the victim.

-13-