# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 18, 2012

## STATE OF TENNESSEE v. RONALD GENE PULLON

**Appeal from the Sullivan County Circuit Court**
**No. S58618   Robert H. Montgomery, Jr., Judge**

---

**No. E2012-00385-CCA-R3-CD - Filed January 4, 2013**

---

Defendant was convicted after a trial by jury of two counts of sexual battery, Class E felonies. He was sentenced to eighteen months probation on each count, with the sentences to be served concurrently. On appeal, the defendant claims that the trial court erred by ruling that the defendant could not cross-examine the victim concerning her history of mental illness and use of prescription medications. After review, we conclude that the trial court did not err by limiting the scope of the defendant's cross-examination of the victim. We affirm the judgments of the trial court accordingly.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, and D. KELLY THOMAS, J.J., joined.

Steve Wallace, District Public Defender; William A. Kennedy (on appeal) and W. Andrew Kennedy (at trial), Assistant Public Defenders; for the appellant, Ronald Gene Pullon.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Barry Staubus, District Attorney General; and Teresa A. Nelson, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On December 14, 2012, the defendant, Ronald Gene Pullon, was indicted on two counts of sexual battery in violation of Tennessee Code Annotated section 39-13-505, Class

E felonies. The charges stem from an encounter between the victim and the defendant that occurred on September 28, 2010. At the defendant's trial on December 12, 2011, the victim, the defendant, and the arresting officer were the only witnesses.

The victim testified that she had recently moved into a new apartment complex in Bristol and had been living there for a few weeks when her neighbor—with whom she had previously spoken on a few occasions—gave her some chicken and asked her to cook it for him. When she returned with a plate full of food, she attempted to give it to the defendant through the door, but he insisted that she come inside. When she entered the defendant's apartment and put the food on the stove, the defendant kissed her and gave her a "bear hug" around her ribs. The victim testified that this "hug" was painful, and at the time she believed that the defendant had broken her ribs. She testified that she doubled over in pain afterward.

The victim testified that she went toward the back door in an effort to leave, but the defendant grabbed her and pulled her back. She testified that the defendant proceeded to put his hand under her shirt and touch her naked breast. She testified that she told the defendant to stop, but he did not do so. Instead, he put his hand down the front of her pants and touched the "hair" on her pelvic area. The victim testified that she told the defendant, "No. Stop. I'm leaving and I'm not coming back." Then she "stormed out the door." The victim testified that as she was leaving, the defendant said, "I wouldn't do it if I didn't like you." The victim testified that she did not give consent for the defendant to touch her and had never allowed him to touch her in the past.

The defendant testified that he was seventy-six years old. He testified that the victim was not telling the truth about what had transpired on the day in question. He testified that when he first met the victim, he felt sorry for her, because she "looked kind of down and out." He testified that he offered to give the victim some chicken if she wanted to cook it. He testified that the victim asked him if he wanted to have some as well. He testified that he responded, "You can bring a piece of it up here if you care—if you want to."

The defendant testified that the victim returned that evening and entered his apartment without knocking. He testified that she said, "Here – here's this chicken" and set it down on the end of the bar next to the stove. He testified that he gave her a pat on the shoulder or the back and said, "I appreciate that. I thank you very much." Then the victim left.

The defendant testified that next thing he knew, "the law was there after [him]." The defendant denied touching the victim's breast or putting his hand down her pants and testified, "they was no hugs or kisses or feeling or nothing at all about it." The defendant testified that the victim was in his apartment for approximately five minutes in total.

On cross-examination, the defendant testified that the police arrived about four hours after he told the victim, "thank you." The defendant testified that he recalled speaking with the police officers when they arrived at his apartment. The defendant testified that he did not remember ever telling the officers during their investigation that he had hugged the victim or that he had rubbed her ribs, but he claimed that "in a state like that you're liable to say anything."

Officer Matthew Cousins of the Bristol Tennessee Police Department testified in rebuttal that he was dispatched, along with other officers, to the victim's residence on the date in question. He testified that he had heard the victim's testimony and that she had told him the same story on the day that he responded to the call. He testified that after receiving this information he went to the defendant's apartment and spoke with the defendant. He testified that he told the defendant what the victim had told him and that the defendant initially denied that "anything" had taken place. Officer Cousins testified that the defendant later told him that he had given the victim a hug to thank her for preparing the chicken, and the victim had been injured and doubled over. Officer Cousins testified that the defendant claimed that he had rubbed the victim's ribs on the outside of her shirt to make her feel better.

Following this testimony, the trial court instructed the jury and the parties gave closing arguments. The jury retired to deliberate at 11:47 a.m. on December 12, 2012, and returned with a verdict finding the defendant guilty as charged at 12:48 p.m. that same day. The trial court sentenced the defendant to eighteen months on each count to be served concurrently but permitted the defendant to serve his sentence on supervised probation. The defendant filed a timely motion for new trial on December 29, 2011, which was denied by the trial court on February 10, 2012. The defendant filed a timely notice of appeal, and the matter is now properly before this court for review. Our decision follows.

## ANALYSIS

The defendant claims that the trial court erred by ruling that the defendant could not cross-examine the victim concerning her history of mental illness and use of prescription medications. The defendant contends that the trial court's decision violated his constitutional right to confront the witnesses against him. However, after reviewing the record, we conclude that the trial court did not abuse its discretion by so limiting the scope of the defendant's cross-examination.

"[C]ross-examination is a fundamental right." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). While a "defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination," *State v. Wyrick*, 62

S.W.3d 751, 770 (Tenn. Crim. App. 2001), "[t]he propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the sound discretion of the trial court." *Dishman*, 915 S.W.2d at 463. Moreover, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). "Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right." *Dishman*, 915 S.W.2d at 463.

When the witness sought to be cross-examined is a key witness for the prosecution, a wider scope of cross-examination must be permitted. *See State v. Barnes*, 703 S.W.2d 611, 618 (Tenn. 1985). The constitutionally-mandated scope of cross-examination with respect to key prosecution witnesses includes evidence of mental instability, but only if such instablility is "shown to have existed within a reasonable time of the events about which the witness testifies or within a reasonable time before the testimony is given." *Id.* at 619. With these standards in mind, we proceed to review the defendant's claim in light of the record existing in the case before us.

Prior to trial, the trial court conducted a jury-out hearing concerning a motion *in limine* that had been filed by the State with respect to the victim's testimony.[1] At that hearing, the victim testified that she was taking several prescription medications at the time of the incident. She testified that none of these medications altered her mental health status. She also testified that none of these medications negatively affected her memory.

On cross-examination, the victim testified that she had been committed thirty years earlier for post-partum depression. The victim also testified that she had experienced some delusional thoughts during this time period. The victim testified that she did not have any such thoughts when she was taking her medications, and she had been consistently taking her medications for the last twelve years. The victim also testified that she had been voluntarily treated at an in-patient mental health facility five or six years earlier for having suicidal thoughts.

After receiving this evidence, the trial court granted the State's motion *in limine*. The trial court explained, "there's a lot of people out there in the world that take medication" and "[j]ust the fact that she takes medication doesn't . . . in and of itself . . . mean that . . . there's . . . any . . . affect[] [on] her ability to . . . remember and testify with regard to . . . what happened on . . . that particular date." Moreover, the trial court reasoned that "[j]ust throwing out medication[s] to the [j]ury's just going to cause them to speculate as to what

---

[1] No copy of this motion appears in the record.

they might mean." The trial court ruled based on the testimony before it that the evidence concerning the victim's mental health issues was not relevant.

We find no fault with the trial court's reasoning. As the only witness for the prosecution who testified during the State's case-in-chief, the victim was unquestionably a "key" prosecution witness. Consequently, the defendant had a constitutional right to cross-examine the witness concerning her mental instability if he could establish that the instability existed within a reasonable period of time before the events in question or before her trial testimony.

However, the defendant failed to carry this burden. The victim's testimony stands undisputed in the record. The victim testified that she had not had any delusional thoughts within the last twelve years. To the extent that it could be argued that her having suicidal thoughts—thoughts that led her to undergo a voluntary commitment—reflected some underlying mental instability, the victim testified that these events occurred over five years prior to trial. There is no testimony or other evidence appearing anywhere in the record that establishes that the victim suffered from any mental instability within a reasonable period of time before the incident or her testimony at trial.

The defendant argues that the requisite "temporal recency" is established because "the witness is still being treated for her psychological disorders." However, the *Barnes* court did not establish a constitutional right permitting defendants to question key State witnesses concerning evidence of recent mental health treatment. It established a constitutional right to question key State witnesses concerning evidence of their recent mental instability. As the trial court properly concluded, many individuals take medicine their entire lives to treat chronic conditions, mental or otherwise, without ever exhibiting symptoms. We do not believe that the *Barnes* court intended to require trial courts to admit evidence concerning delusional thoughts, which occurred almost twelve years prior to the relevant events simply because the witness at issue continues to take medicine as a prophylactic measure to ensure that such thoughts never return.

Consequently, the trial court did not violate the defendant's right to confrontation by limiting his right to cross-examine the victim with respect to these issues. In so ruling, we do not mean to suggest that trial courts are without authority to permit cross-examination concerning a witness's prior mental instability, even when such instability occurred years in the past, if the trial court determines that the probative value of that evidence exceeds its potential for prejudice. We merely affirm that a trial court does not violate constitutional norms by limiting the scope of cross-examination when the potential of such evidence to mislead or confuse the jury greatly exceeds its probative value or when consideration of other legally-relevant factors counsels against its admission.

**CONCLUSION**

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE