# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 27, 2004 Session

## STATE OF TENNESSEE v. LINDA H. OVERHOLT

**Appeal from the Criminal Court for Hamilton County**
**No. 233433    Rebecca J. Stern, Judge**

---

**No. E2003-01881-CCA-R3-CD - Filed January 21, 2005**

---

Convicted of five counts of selling marijuana, the defendant, Linda H. Overholt, appeals and challenges the sufficiency of the convicting evidence, the prosecutor's trial conduct, various evidentiary rulings of the trial court, the denial of judicial diversion, and the trial court's sentencing determinations. Because the record supports the judgments of the trial court, we affirm the convictions and sentences.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Ardena J. Garth, District Public Defender; Karla Gothard, Assistant District Public Defender; and Donna Robinson Miller, Assistant District Public Defender (on appeal), for the Appellant, Linda H. Overholt.

Paul G. Summers, Attorney General & Reporter; Michelle Chapman McIntire, Assistant Attorney General; William H. Cox, III, District Attorney General; and Mary Sullivan Moore, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

A Hamilton County Criminal Court jury convicted the defendant of the following offenses:

| Count | Offense | Class | Offense Date |
|-------|---------|-------|--------------|
| 1. | Sale of marijuana | Class A misdemeanor | February 25, 2000 |
| 2. | Sale of marijuana | Class E felony | March 18, 2000 |

|   |   |   |   |
|---|---|---|---|
| 3. | Sale of marijuana | Class E felony | April 7, 2000 |
| 4. | Sale of marijuana | Class E felony | May 14, 2000 |
| 5. | Sale of marijuana | Class E felony | May 19, 2000 |

The trial court imposed concurrent, Range I (standard offender) sentences of one year per conviction for the felonies and a concurrent six-month sentence for the misdemeanor, yielding an effective sentence of one year. The trial court granted probation and imposed a four-year probationary period. Aggrieved of the convictions and sentences, the defendant appeals and raises the following issues:

1. The evidence was insufficient to support the convictions.

2. The trial court erred in allowing the jury to listen to audiotapes of the drug transactions when the tapes were never "played in evidence."

3. The trial court erred in admitting audiotapes of the drug transactions when the tapes were substantially unintelligible.

4. The trial court erred in admitting the detective's handwritten notes attached to the audiotapes.

5. The trial court erred in admitting a videotape of the defendant's interrogative statement.

6. The prosecutor committed misconduct by repeatedly referring to the defendant's married surname of Al-Azzam, thereby evoking prejudice against the defendant in the wake of the terrorist events of September 11, 2001.

7. The trial court erred in refusing to order the state to submit to the defendant criminal and employment histories of the confidential informant who testified at trial.

8. The trial court erred in disallowing the defendant access to the Hamilton County Sheriff's Department's narcotics division policies and procedures manual.

9. The trial court erred in disallowing the defendant to cross-examine the prosecuting officer about the recording equipment used to generate audiotapes of the drug transactions.

10. The cumulative effect of errors requires reversal.

11. The trial court erred in denying judicial diversion.

12. The trial court erred in declining to sentence the defendant as a mitigated offender.

13. The trial court erred in failing to follow the requirements of *Blakely v. Washington*, 542 U.S. __ , 124 S. Ct. 2531 (2004), in sentencing the defendant.[1]

Finding no reversible error in the proceedings in the trial court, we affirm the defendant's convictions and sentences.

The evidence supporting the convictions showed that a Hamilton County Sheriff's deputy arrested Tim Smith for attempting to procure prescription narcotics via a forged prescription order. In the course of discussing the pending case with the officers, Mr. Smith and/or his wife, Tina Smith, stated that they had information that the defendant, an administrative employee of the Chattanooga Police Department, was selling marijuana. Eventually Ms. Smith agreed to act as a confidential informant to buy marijuana from the defendant as a means of gaining prosecutorial leniency in Mr. Smith's case.

Hamilton County Detective Mark King supervised the operation. He recounted about the police procedure for monitoring and ensuring the integrity of the transaction, whereby the police would search an informant before and after a transaction and monitor the transactions via a audio recorder concealed on the informant. Detective King testified that Tina Smith, who was a casual acquaintance of the defendant, attempted to reinforce her relationship with the defendant by making social contacts with her and that the officers did not attempt to monitor or record these preliminary conversations. Ultimately, Ms. Smith arranged to buy a "quarter bag" of marijuana from the defendant. The officers searched the defendant and gave her 40 dollars for the purchase. She went to the defendant's home on February 25, 2000, and returned to the officers' meeting point with one quarter ounce of marijuana. The officers searched her and found no money and no other contraband.

Detective King testified to similar procedures and results on March 18, April 7, May 14, and May 19, 2000. On March 18, Ms. Smith used $100 supplied by the officers to purchase an ounce of marijuana from the defendant, who was staying at a motel with her boyfriend-soon-to-be husband, Naim Al-Azzam. On April 7 and again on May 14, Ms. Smith purchased an ounce of marijuana from the defendant at her new apartment address. On May 19, Ms. Smith met the defendant at the Southland Grocery Store, where she purchased an ounce of marijuana from her.

---

[1] We have renumbered and reordered the issues as stated by the defendant in her brief. We note that in some cases the defendant's brief set forth multiple issues within a single designated issue. In our ordering of the issues, we have endeavored to list the several issues separately.

Detective King identified and placed into evidence 12 audiotapes that he made via Ms. Smith's concealed recording device used during the drug transactions. The tapes were not played before the jury. The detective testified that the conversations on the tapes were virtually unintelligible.

On cross-examination, Detective King agreed with defense counsel that the pre-transaction searches of Ms. Smith may have been ineffectual in uncovering any contraband that Ms. Smith may have carried to the meetings with the defendant. Also, he conceded that Ms. Smith had conversations with the defendant that were not monitored or recorded and that the transactions for which the defendant was convicted occurred outside the officers' sight and presence.

Tina Smith testified and detailed each marijuana purchase that had been outlined by Detective King. On cross-examination, she admitted that she had previously been convicted of passing a worthless check.

A series of forensic scientists testified that the material submitted by the Hamilton County Sheriff's Office and introduced into evidence by Detective King was marijuana.

Hamilton County Deputy Jeff Parton testified that, acting as an undercover operative, he accompanied Tina Smith to the defendant's residence on March 3, 2000, to purchase marijuana. Although the defendant indicated a willingness to take Parton and Smith to a location where they could buy the drug, she had no marijuana on hand. Smith and Parton declined to accompany her and departed without securing a purchase.

Hamilton County Detective Brian Ashburn testified about his interrogation of the defendant after she had been arrested. He testified that the defendant admitted to previously using marijuana and to having it inside her residence, but she denied ever selling it. Detective Ashburn introduced a videotape of the interview, but the first 27 minutes of the tape, which was played before the jury, had no accompanying sound.

The defendant neither testified nor presented witnesses in her behalf.

### I. Sufficiency of the Evidence.

In her first issue, the defendant challenges the sufficiency of the convicting evidence. In determining the sufficiency of the convicting evidence, the appellate court does not re-weigh or re-evaluate the evidence, *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), and does not substitute its inferences for those drawn by the trier of fact from circumstantial evidence, *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). The appellate court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and

circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

To establish that the defendant unlawfully sold marijuana, the state was required to prove that she knowingly sold marijuana, a controlled substance. *See* Tenn. Code Ann. §§ 39-17-415 (2003), -417(a)(3) (Supp. 2004).

At trial, defense counsel adroitly stripped the state's case down to an issue of the credibility of Tina Smith. Counsel succeeded in getting the testifying officers to concede that only Tina Smith actually knew about the transactions between herself and the defendant. Through cross-examination, counsel developed the proposition that Ms. Smith had the opportunity and motive to manufacture evidence against the defendant. Moreover, counsel attempted to impeach Ms. Smith through a searching cross-examination and introduction of Ms. Smith's prior conviction of passing a worthless check. That said, the defendant had her day in court before the jury on the issue of Tina Smith's credibility. The jury, however, rejected the defendant's theory and accredited Ms. Smith's testimony, as was its prerogative as the final arbiter of credibility and the weight to be accorded testimony. We neither revisit these issues nor apply our own inferences in the stead of those applied by the jury. As long as the evidence contains proof which, if accredited, establishes the elements of the offenses, the sufficiency of the evidence is sound on appeal. That being the case here, the evidence is legally sufficient to support the convictions.

## II. Issues Concerning the Audiotapes of the Drug Transactions.

The defendant essentially presents three different complaints about the use of the audiotapes of the drug transactions made via Tina Smith's concealed recording device.

*A. The submission of the tapes to the jury for their use during deliberation when the tapes had not been played in court.*

Through Detective King, the state introduced into evidence 12 audiotapes of Tina Smith's transactions with the defendant. The tapes were not played in court. The defendant claims that, during deliberation, the jury requested audiotape playing equipment and infers that the jury listened to the tapes during deliberation.

The defendant relies upon *State v. Michael Wayne Henry*, No. 02C01-9611-CC-00382 (Tenn. Crim. App., Knoxville, May 29, 1997), in which this court reviewed a factual situation similar to that as posed by the defendant in the present case. In *Michael Wayne Henry*, the defendant was convicted of selling drugs, and the officers had audiotapes of the transactions. *Id.*, slip op. at 4. As in the present case, the officer testified that the conversations on the tapes were unintelligible, *id.*, slip op. at 7, and although the tapes themselves were introduced into evidence, the tapes were not played for the jury. During deliberation, the jury asked to listen to the tapes, but the trial court declined to allow them to do so. *Id.* On appeal, Henry complained that the trial court erred in denying the jury's request to hear the tapes; however, this court said,

In this instance, the contents of the tapes were not in evidence. Neither the state nor the defense requested that the tapes or any portion thereof be played for the jury. The trial court properly denied the jury's request to review the tapes in the jury room.

*Id.*

Although we believe that the defendant has cited the applicable law, we cannot agree that the facts in the present case support the defendant's argument. The trial transcripts reveal that the jury retired to deliberate on August 15, 2002, at 6:35 p.m. and was released for the evening when court adjourned at 10:15 p.m. The record next reports that the jury returned its verdicts on August 16, 2002, at 1:25 p.m. The record reveals no request by the jury for audiotape playing equipment. Defense counsel raised the issue in the hearing on the motion for new trial by stating that someone had told her that the jury had requested the equipment during deliberation. The trial judge indicated that she did not recall that such a request was made. Thus, given this state of the record, the defendant has failed to establish that the jury played the audiotapes during deliberation. We conclude, therefore, that the factual basis for the claim has not been established.

*B. The admission into evidence of audiotapes with unintelligible content.*

In this issue, the defendant claims that the trial court erred in admitting the audiotapes into evidence because the content of the tapes was unintelligible. First, the defendant's claim is waived for failure to timely object when the evidence was offered into evidence. *See* Tenn. R. Evid. 103(a). Second, as in *Michael Wayne Henry*, the *contents* of the tapes were never placed into evidence. *See Michael Wayne Henry*, slip op. at 8. The court received only a collection of 12 physical objects. Because no content of the tapes was introduced as evidence, whether that content is unintelligible is of no concern.

*C. The submission of the audiotapes to the jury with the police officer's "stick-on" tabs that provided tape cue information.*

When the audiotapes were introduced as a collection of physical objects, the officer had attached "stick-on" tabs to indicate whether the whole tape should be played or whether the tape had been cued at a place other than the beginning. No objection was made to the admission of the tapes or the tabs. Later, when the parties had rested and the court was assembling exhibits for the jury's reference during deliberation, the defendant objected to the tabs being affixed to the tapes. The trial court overruled the objection, citing its belief that removal of the tabs after the evidence had been closed would be tantamount to tampering with the evidence.

In our view, the objection to the inclusion of the tabs was waived when no objection was made contemporaneously with the introduction of the tapes into evidence. *See* Tenn. R. Evid. 103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record . . . ."). At any rate, we have reviewed the

tabs in question and are at a loss to discern any possible prejudice to the defendant as a direct result of the information contained thereon. To the extent that the defendant is arguing that the cue information may have directed the jury to content that was prosecution favorable, we remind the defendant, as we noted in a preceding subsection of this opinion, that the record evinces no proof that the jury ever played the audiotapes. Thus, we hold that the claim has been waived and comment that, even if it had not been, we would have found no prejudicial error.

In sum, we find no reversible error regarding the trial court's admission and use of the audiotapes of the drug transactions.

### III. Admission of the Videotape of the Defendant's Interview with Police.

In this issue, the defendant argues that the trial court erred in admitting into evidence a videotape of a police interview of her on which the audio track malfunctioned for 27 minutes, producing no sound when the tape was played in court. The defendant relies substantially upon *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). In *Ferguson*, officers videotaped the defendant's performance on field sobriety tests administered as part of a driving under the influence investigation; however, the taped tests were inadvertently "taped over" before they were viewed by anyone. *Id.* at 914-15. Our supreme court determined that, for purposes of applying the Tennessee Constitution's "law of the land" clause to issues of the state losing, damaging, or destroying potentially exculpatory evidence, a balancing test should be utilized. First, the court should "determine whether the State had a duty to preserve the evidence." *Id.* at 916. If the state failed to discharge a duty to preserve evidence, the court then determines the degree of negligence involved, the significance of the destroyed evidence, "considered in light of the probative value and reliability of secondary or substitute evidence that remains available," and the sufficiency of the other evidence used at trial to support the conviction. *Id.* at 917.

In our view, *Ferguson*'s balancing test need be applied no further than to inquire whether the state had a duty to preserve the evidence. In the present case, Detective Brian Ashburn testified that the audio recording equipment was old and would occasionally fail to record without alerting the operator that the system was malfunctioning. In *Ferguson*, the police made a tape recording but subsequently destroyed it. In the present case, however, the audio recording was apparently never made. Furthermore, at the point in time when the interview was being conducted, the state had no duty to preserve it via videotape. *See* Tenn. R. Crim. P. 16(a)(1)(A) (requiring state, upon the defendant's request, to furnish the defendant with copies of any written or recorded statement given by the defendant, as well as "the *substance* of any oral statement which the state intends to offer in evidence at the trial made by the defendant") (emphasis added). Accordingly, we discern no state duty to preserve the oral statement, and we need analyze the *Ferguson* factors no further.

## IV. Prosecutorial Misconduct.

In this issue, the defendant claims that the prosecutor committed prejudicial misconduct when she repeatedly referred to the defendant as Linda Al-Azzam or Ms. Al-Azzam. The defendant maintains that because the case was tried less than a year after the terrorist attacks of September 11, 2001, the approximately 120 references to the defendant's married surname indicated nothing less than a ploy to prejudice the jury against the defendant, who had been known to the prosecutor and many of the state's witnesses as Linda Overholt. The defendant married Mr. Al-Azzam shortly after she was indicted in the present case. Although the defendant asserts that the marriage was of brief duration, the record contains no indication that Al-Azzam was not the defendant's surname at the time of trial. Apparently, the state moved pretrial to amend the indictments in the present case to add the defendant's married name.[2] Additionally, Mr. Al-Azzam was present during some of the drug transactions, and the state asserts that his identity as the defendant's boyfriend at the time of the transactions inevitably would have been divulged as an integral part of state-sponsored testimony. We agree with state's position that the record fails to establish a claim of prosecutorial misconduct.

Improper questioning or argument is not *per se* reversible error. *See Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965) (test is "whether the improper conduct could have affected the verdict to the prejudice of the defendant"). We have previously identified five factors which should be considered in making this determination:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In the present case, the circumstances were that the defendant actually assumed the surname of Al-Azzam prior to trial, and apparently Al-Azzam was her surname at the time of trial.

---

[2]Although at one point in the proceedings the trial judge stated that the indictment had been so amended, we found no order in the record to effect such an amendment.

Thus, the prosecutor was guilty of nothing but precision in her references to the defendant.[3]  The factual basis for using the married surname strongly belies the claim that the surname was used for purposes of inciting prejudice among the jurors.

We found in the record no admonitory instructions given to the jury, but the defendant has cited us to no references in the record where she called the claimed misconduct issue to the attention of the trial court during trial.[4]  Given that Al-Azzam was the defendant's proper name at the time of trial, the trial court can hardly be expected to divine that something other than precision was intended or resulted from the use of the reference.  Similarly, we can divine from the record no intention of the prosecutor other than to be precise.  We have found no other harmful errors to exacerbate the effect of referring to the defendant as Ms. Al-Azzam.  Although the strength of the state's case depended ultimately upon the credibility of Ms. Smith, the defendant did not testify.  There was no "she said – she said" imbroglio for the jury to resolve.  All in all, we conclude that the defendant has failed to show that the prosecutor acted improperly or that any misconduct was egregious or prejudicial enough to require a reversal.

### V.  Trial Court's Refusal to Order the State To Furnish the Defendant with an NCIC Report of Ms. Smith's Criminal Record and Limitation of Her Cross-examination of Smith.

The defendant filed a pretrial motion to compel the state's disclosure of "impeachment evidence."  In arguing the motion, defense counsel specifically sought evidence of Tina Smith's prior criminal record.  At some point, the defense became aware that Ms. Smith had been convicted in Tennessee of passing a worthless check.  Despite that Ms. Smith had lived outside Tennessee during the pendency of the case, the trial court declined to order the state to perform an "NCIC" check of Ms. Smith.  The court indicated that upon the defendant's cross-examination of Ms. Smith about her criminal record, the court would expect the state to furnish the relevant information if it found that she lied under oath.

During trial and in response to a state motion, the trial court ordered the defendant not to cross-examine Ms. Smith about the location of her current residence and denied the defendant's request to be furnished with Ms. Smith's employment information.[5]

---

[3]We note that during the sentencing hearing, defense counsel asked the probation officer on cross-examination, "Now, . . . Ms. Moore was asking you if you had some trouble contacting Ms. Overholt *or Ms. Al-Azzam*.  You had been given a telephone number, is that correct?"  (Emphasis added.)

[4]Before trial, the defendant, in opposing the state's motion to amend the indictment by adding the surname, argued before the trial court that the amendment would be prejudicial in light of the events of September 11, 2001.

[5]Before trial, the defendant, in opposing the state's motion to amend the indictment by adding the surname, argued before the trial court that the amendment would be prejudicial in light of the events of September 11, 2001.

First, we examine the claim that the trial court erred in refusing to order the state to furnish the defendant with the results of an "NCIC" check of Ms. Smith's criminal record. The defendant acknowledges that in *State v. Workman*, 667 S.W.2d 44 (Tenn. 1984), our supreme court said that neither the Tennessee Rules of Criminal Procedure nor our decisional law imposes on the state a duty to provide to the defense the "arrest histories" of state witnesses. *Id.* at 51. Rather, the defendant bases her claim for relief upon *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375 (1985).

In *Brady v. Maryland*, the United States Supreme Court held that the prosecution has a constitutional duty to furnish an accused with exculpatory evidence pertaining to either the accused's guilt or innocence and the punishment that may be imposed. Failure to reveal exculpatory evidence violates due process when the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution. *Brady,* 373 U.S. at 87, 83 S. Ct. at 1196-97. Decisions subsequent to *Brady* have established that to prove a due process violation, the defendant must show that the information was requested (unless the evidence is obviously exculpatory, in which case the state is bound to release the information whether requested or not), that the state suppressed the information, that the information was favorable to the accused, and that the information was material. *State v. Edgin*, 902 S.W.2d 387, 389-90 (Tenn. 1995) (Opinion on Petition for Rehearing); *see Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."). The suppressed information is considered material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S. Ct. 3383. A reasonable probability, the Supreme Court has explained, is a probability sufficient to "undermine confidence in the outcome" of the trial. *Id.*

In *Bagley*, the United States Supreme Court said, "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Id.* at 675, 105 S. Ct. at 3380. Impeachment evidence is "'evidence favorable to an accused,' . . . so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.*

In the present case, even if the state had been shown to have suppressed "NCIC" data, the defendant has demonstrated neither the materiality of the information sought nor that it would have been favorable to the accused. Specifically, she has failed to show that any criminal history information on Ms. Smith existed, other than the known conviction of passing a worthless check. We have no basis for concluding that any "NCIC" report would have offered additional grounds to impeach Ms. Smith. Thus, we discern no merit in the *Brady* argument.

The defendant's claim that her cross-examination of Ms. Smith was erroneously limited preventing her from inquiring about Ms. Smith's employment record is addressed by another facet of due process. The defendant's constitutional right to confront witnesses includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S. Ct. 989,

998 (1987), *limited on other grounds by Jefferson City of Tarrant*, 522 U.S. 75, 118 S. Ct. 481 (1997); *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000). Denial of the defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Indeed, the right to confrontation does not preclude a trial court from imposing limits upon cross-examination that take into account such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). This court will not disturb the limits that a trial court has placed upon cross-examination unless the lower court has unreasonably restricted the right. *Dishman*, 915 S.W.2d at 463.

The claims of denial of the right to confront a witness against the defendant and of denial of due process via the denial of cross-examination are waived. The defendant cited no authority in support of the claims expressed as a denial of effective cross-examination. R. Tenn. Ct. Crim. App. 10(b) (issues unsupported by citation to authorities will be treated as waived). In any event, the record reveals no merit to the claim. The state established that, prior to trial, the defendant had threatened to harm Ms. Smith and to protect Ms. Smith, the state sought to keep defense counsel from inquiring about Ms. Smith's residential address and place of employment. Thus, the record supports a reasonable limitation upon the cross-examination of Ms. Smith as a means of witness safety.

We might quibble whether witness safety was minimally served, if at all, by disallowing inquiries about Ms. Smith's employment *history*, but the record evinces no basis for concluding that this limitation precluded the defense from revealing impeachment material. Thus, if this additional limitation upon cross-examination was error, we have no pause in concluding that the error was harmless beyond a reasonable doubt. *See State v. Howell*, 868 S.W.2d 238, 253 (Tenn. 1993) (recognizing that confrontation clause violations are subject to harmless error analysis).

### VI. Denial of the Defendant's Request to be Furnished With Copies of the Sheriff's Department Procedural Manual and Denial of Cross-examination About the Recording Equipment Used to Monitor/Record the Drug Transactions.

In this issue, the defendant complains that the trial court erred in limiting her cross-examination of the detectives concerning the specifications of the recording equipment used during the undercover operation. The defendant argues on appeal that denying her access to the information precluded her from showing and arguing that the undercover operative could have intentionally tampered with the equipment to "render [the] tapes inaudible." Additionally, the defendant claims that the trial court erred in denying her request to review the Policies and Procedures Manual of the Hamilton County Sheriff's Department, Narcotics Division. She claims that use of the manual would have enabled her to show that the detectives violated department policy by availing to Ms.

-11-

Smith the opportunity to "plant evidence." She claims that the trial court's actions were errors pursuant to Rules of Evidence 401, 402, and 611(b). *See* Tenn. R. Evid. 401 (defining relevant evidence as that which tends to make the existence of any consequential fact "more probable or less probable than it would be without the evidence"), 402 (stating that, subject to other applicable rules of admissibility, relevant evidence is admissible), 611(b) (authorizing cross-examination on any relevant matter, including credibility of the witness). She also claims that the trial court's actions violated her rights to general due process of law.

The trial court has discretion in determining whether evidence meets the test for relevancy. *State v. Webster*, 81 S.W.3d 244, 249 (Tenn. Crim. App. 2002); *State v. Forbes*, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995). Also, the "propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Thus, we review these issues under an abuse of discretion standard. *See, e.g., State v. Mickens*, 123 S.W.3d 355, 382 (Tenn. Crim. App. 2003).

Looking first at the claim that the defense should have been allowed to utilize the narcotics division's procedures manual to cross-examine the division's detectives, we do not comprehend how the standard procedures requiring the search of undercover drug informants are related to whether the detectives in fact allowed Ms. Smith the opportunity to "plant evidence." Detective King explained the rationale for searching the informant before and after the drug transaction, and he admitted that the pre-transaction searches of Ms. Smith could have failed to detect planted evidence. In short, we find no abuse of the trial court's discretion in limiting evidence pertaining to the content of the procedures manual.

The defendant claims that her defense was flummoxed by the trial court's limitation on her cross-examination of the detectives about the specifications of the transmitting/recording equipment used to record the drug transactions. Specifically, she claims that this limitation on the evidence precluded her from pursuing the argument that the type of equipment used could have availed Ms. Smith the opportunity to render the recorded conversations inaudible. The immediate problem with this claim is that nothing of record informs us whether a particular type of equipment was more susceptible than other types to manipulation. When evidence is excluded, "the substance of the evidence and the specific evidentiary basis supporting admission" must be made known to the court by proffer, unless apparent from the context. Tenn. R. Evid. 103(a)(2). Otherwise, the issue generally may not be adjudicated on appeal. *Id.* 103(a). Here, we find no proffer or other evidence of record that would illustrate the relevance of distinguishing between types of recording equipment. Thus, given the state of the record on this issue, we presume that the trial court acted within its discretion in limiting cross-examination about the recording equipment.

Finally, we address the claim that the trial court's rulings on these two matters violated the defendant's constitutional rights. This claim was unsupported by citation to relevant authority and is waived. *See* R. Tenn. Ct. Crim. App. 10(b).

-12-

## VII.  Cumulative Error.

The defendant posits that the combination of the rulings and errors as detailed above precluded a fair trial and require reversal.  We disagree.  Generally, we have found no error, and when possible error was discerned, we deemed it legally harmless.  In particular, we believe that any possible error in forbidding the cross-examination of Ms. Smith on the issue of her employment record was innocuous and was insufficient to justify a loss of confidence in the outcome of the trial, even when viewed in combination with other claimed errors.

## VIII.  Judicial Diversion.

The defendant complains that the trial court erred in denying judicial diversion.  *See* Tenn. Code Ann. § 40-35-313(a)(1) (2003).  This procedure is similar to pretrial diversion; however, judicial diversion follows a determination of guilt, and the decision to grant diversion rests with the trial court, not the prosecutor.  *State v. Anderson*, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992). The presumption of favorable candidacy for alternative sentencing set forth in Tennessee Code Annotated section 40-35-102(6) does not apply, and a denial of judicial diversion is subject to reversal on appeal only if that court abused its discretion. *State v. Electroplating, Inc.*,  990 S.W.2d 211, 228-29 (Tenn. Crim. App. 1998); *State v. Bonestel*, 871 S.W.2d 163, 167 (Tenn. Crim. App. 1993), *overruled in part on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).  When a defendant challenges the denial of judicial diversion, we may not revisit the issue of whether the record contains any substantial evidence supporting the trial court's decision. *State v. Robinson*, 139 S.W.3d 661, 665 (Tenn. Crim. App. 2004); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

In determining whether to grant judicial diversion, the trial court must consider (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as others, and (g) whether judicial diversion will serve the interests of the public as well as the accused.  *Parker*, 932 S.W.2d at 958;  *Bonestel*, 871 S.W.2d at 168.  Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination.  The court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others.  *Id.*

The trial court found that, although the defendant had no prior criminal record, her lack of veracity and failure to take responsibility for the conviction crimes bespoke a lack of amenability to correction. The court cited evidence presented in the sentencing hearing that the defendant had been dishonest with her present employer concerning her missing work for court dates.  The trial court was troubled by the fact that, in the defendant's statement to the probation officer who prepared the presentence report, she blamed other people for her imbroglio.

-13-

In reviewing the circumstances of the offense, the trial court relied upon the defendant's commission of a series of offenses over a period of time, as opposed to an impulsive, isolated offense. The court referred to a "mixed" social history and expressed concern that the defendant had admitted using marijuana and had been unsuccessful in self-management of her alcohol abuse. The court found that the defendant's physical and mental health could not be weighed either way, due to a paucity of evidence on those issues. The court gave some weight to the deterrence value of denying diversion, citing the prolonged nature of the offending and the high-profile nature of the case.

Finally, the court found that judicial diversion would not serve the interests of the public or the defendant, based upon the defendant's attitude of minimizing the offenses and blaming them on other people. The court expressed marginal concern that the defendant was an employee of a law enforcement agency when she sold the marijuana. Obviously, the court thoroughly considered the pertinent factors and, with reference to each factor, stated on the record its reasons for denying judicial diversion. The facts relied upon by the trial court are supported in the record. Therefore, we hold that the record establishes that the trial court acted within its discretion in denying judicial diversion.

## IX. Sentencing Issues.

At this juncture, the defendant claims that the trial court erred in declining to sentence her as an especially mitigated offender and violated her right to a jury trial in establishing her sentences.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id.* In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id.* If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

A defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6) (2003). In the present case, the defendant was afforded the sentencing alternative of probation.

*A. Sentencing Range.*

The defendant was sentenced as a standard, Range I offender. *See* Tenn. Code Ann. § 40-35-105(a)(4) (2003) (standard offender is one not sentenced, *inter alia*, as an especially mitigated offender). The defendant claims she should have been sentenced as an especially mitigated offender,[6] thereby availing to her a reduction of the Range I minimum sentence by nine percent, a reduction of her release eligibility date to 20 percent of the sentence, or both reductions. *See id.* § 40-35-209(b) (2003). "The court *may* find the defendant is an especially mitigated offender, if: (1) [she] has no prior felony convictions; and (2) [t]he court finds mitigating, but no enhancement factors." *Id.* § 40-35-209(a) (2003) (emphasis added). As suggested by the permissive nature of the language, the question of whether an eligible defendant should be sentenced as an especially mitigated offender dwells within the sound discretion of the trial court. *State v. Blackstock,* 19 S.W.3d 200, 211 (Tenn. 2000); *State v. Braden*, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993).

The trial court found that the defendant had acquired a good employment record and a reputation for industry and that she took care of needy family members. However, the judge stated that she did not attribute enough weight to the mitigating circumstances to further reduce the defendant's sentences below the minimum Range I sentences imposed.

The state concedes that the defendant was eligible for treatment as an especially mitigated offender. Nevertheless, the state claims that the trial court acted within its discretion in rejecting the especially mitigated offender status. We agree. The record demonstrates that the trial judge conducted an extensive sentencing hearing and thoughtfully analyzed the issues before her. Although the judge applied mitigating factors and no enhancement factors, we note that the proof before the court at sentencing showed that the defendant had admitted to prior use of marijuana and to driving a motor vehicle on an expired driver's license. These circumstances indicate that the trial judge did not abuse her discretion in sentencing the defendant as a standard offender. The especially mitigated offender status is essentially a dispensation to unusually meritorious claimants; it is reserved for "instances where the trial judge may desire to depart from even the minimum sentence for a Range I offender and impose lesser penalties." Tenn. Code Ann. § 40-35-109 (2003), Sentencing Comm'n Comments. We hold that the trial court did not abuse its discretion in rejecting the especially mitigated offender status.

*B. Right to Jury Trial.*

In her final issue, the defendant's counsel filed supplemental authority to support her claim that *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004), is "relevant to the sentencing issue in [the] original brief." In *Blakely*, the High Court held that Blakely's

---

[6]On the issue of the proper range determination, we review only the defendant's felony convictions. The sentencing ranges established in Tennessee Code Annotated sections 40-35-105 through 109 do not apply to misdemeanor sentences. *State v. Lauren E. Leslie*, No. 03C01-9804-CR-00125, slip op. at 10-11 (Tenn. Crim. App., Knoxville, March 23, 1999); *see* Tenn. Code Ann. § 40-35-105 (2003), Sentencing Comm'n Comments.

constitutional right to a jury trial was violated when the trial judge, based upon facts he found without the aid of a jury, imposed a sentence in excess of the "maximum" he could have otherwise imposed under state law "without the challenged factual finding." *Id.* at __, 124 S. Ct. at 2536-38. The "maximum" sentence for purposes of *Blakely* "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at __, 124 S. Ct. at 2537. The statutory maximum the court may impose is the maximum "he may impose *without* any additional findings." *Id.* The single exception to this rule is that state law may authorize a trial judge to increase a sentence beyond the maximum based upon "the fact of a prior conviction." *Id.* at __, 124 S. Ct. at 2536; *see Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362 (2000).

Apparently, *Blakely* signals certain infirmities in Tennessee's sentencing scheme. Specifically, Tennessee's procedure for determining the length of a defendant's sentence is called into question. Tennessee Code Annotated section 40-35-210(c) establishes presumptive sentences. *See* Tenn. Code Ann. § 40-35-210(c) (2003). When there are no enhancement or mitigating factors, the presumptive sentence for a Class E felony is the minimum sentence in the applicable range. *Id.* The trial court may impose a sentence in excess of the presumptive sentence only when it finds the existence or one or more enhancement factors enumerated in Tennessee Code Annotated section 40-35-114. *Id.* § 40-35-210(d), (e) (2003). Thus, except for enhancement based upon prior criminal convictions, the court may not increase the sentence above the presumptive or "maximum" sentence without additional findings of fact that would have to be made by a jury.

The only sentencing issue raised in the defendant's brief is whether the trial court should have sentenced the defendant as an especially mitigated offender. We see no *Blakely* implications in this sentencing activity.

Assuming for the sake of analysis that *Blakely* applies to range determination and that our sentencing law effectively establishes a presumptive – and hence "maximum" – range, the standard offender category would be that range, not the especially mitigated offender category. *Compare* Tenn. Code Ann. § 40-35-105 (2003) (establishing default criteria that result in a standard offender finding) *with* Tenn. Code Ann. § 40-35-109 (2003) (establishing criteria for and consequences of an especially mitigated offender finding). A defendant with no criminal record, for instance, is sentenced as a standard offender unless she is *not* sentenced as an especially mitigated offender. Of course, a prior felony conviction record or enhancement factors other than a prior criminal record make a defendant ineligible for especially mitigated offender status. *See id.* § 40-35-109(a) (2003).

On the one hand, then, it can be argued that when no prior criminal record exists, a trial judge cannot find the defendant ineligible for especially mitigated offender status except by violating her right to a jury trial by applying at least one other enhancement factor. On the other hand, the *Blakely* rule is not linked to *eligibility* for sentence *mitigation*; it is tied to a judge finding factual standards to justify *increasing* the sentence beyond the "maximum" or presumptive sentence. As we have shown above, the judge's actions pursuant to section 40-35-109(a) are purely

discretionary; the judge may decline discretionarily to award especially mitigated offender status to even an eligible defendant. In that situation, such as the case at bar where the defendant had no prior convictions and the court found mitigating but no enhancement factors, the defendant falls into the standard offender class by default. *Blakely* holds no sway over this judge-made determination.

## X. Conclusion.

Because we find no reversible error in the proceedings below, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE