# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 6, 2009 Session

## STATE OF TENNESSEE v. JEFFREY SCOTT

### Direct Appeal from the Criminal Court for Shelby County
### Nos. 04-04155-56     W. Otis Higgs, Jr., Judge

### No. W2007-01630-CCA-R3-CD  - Filed April 20, 2009

The defendant, Jeffrey Scott, was convicted by a Shelby County jury of two counts of aggravated robbery, a Class B felony; conspiracy to commit aggravated robbery, a Class C felony; and conspiracy to commit robbery and attempted robbery, both Class D felonies.  He was sentenced by the trial court to concurrent terms of ten years for the aggravated robbery convictions, three years for the conspiracy to commit aggravated robbery conviction, and two years each for the conspiracy to commit robbery and attempted robbery convictions.  In a timely appeal to this court, the defendant challenges the sufficiency of the convicting evidence and argues that the trial court erred in denying his motion to suppress his statement to police and in limiting defense counsel's cross-examination of a witness.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Bruce Kelley, Jr., Memphis, Tennessee, for the appellant, Jeffrey Scott.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Patience Branham and Corliss Shaw, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the October 10, 2003, armed robbery of the defendant's place of employment, a Memphis U-Haul store.  A Crime Stoppers tip led police to question the defendant, who eventually gave a statement admitting that he had planned the robbery with three other individuals, whom police identified as Sean Sumerall, Willie Wilson, Jr. and Leon Selmon.  The Shelby County Grand Jury subsequently returned two separate indictments against the defendant in connection with the case.  In the first, the defendant was charged with Sumerall with conspiracy to

commit robbery and attempted robbery. In the second, the defendant was charged with Wilson and Selmon with conspiracy to commit aggravated robbery and two counts of aggravated robbery. The State elected to try the defendant alone, and he proceeded to trial on all the charges on February 26, 2007.

## Suppression Hearing

The defendant filed pretrial motions to suppress his statement, asserting that the police initiated questioning before giving him Miranda warnings. A suppression hearing was held on April 12 and July 13, 2006. Sergeant Michael Brown of the Memphis Police Department testified that he was assigned to the Robbery Bureau in November 2003 and assisted Sergeant Vivian Murray in the investigation of the U-Haul robbery. He said that Sergeant Murray called the defendant and asked him to come to the robbery office to be interviewed as a witness. Upon his arrival, the defendant was taken to an interview room, where Sergeant Brown and Sergeant Murray first read him his rights and then had him read a few lines aloud to ensure themselves of his ability to read. The defendant appeared to understand his rights, never asked for a lawyer, and agreed to talk to them about the robbery. Sergeant Brown identified two waiver of rights forms signed by the defendant, which were admitted as exhibits to the hearing: one executed on November 10, 2003, and a second on November 11, 2003. He testified that the substance of the defendant's statement was that he had planned the robbery.

On cross-examination, Sergeant Brown was asked to review the affidavit of complaint prepared by Sergeant Murray on November 10, 2003, which stated that the defendant was arrested and brought to the robbery office on that date. In response, he testified that the defendant was "probably detained and brought" to the robbery office and placed on a 48-hour investigatory hold. He said that he and Sergeant Murray did not talk to the defendant about the robbery until after he was brought into the interrogation room, advised of his rights, and signed the waiver of his rights. He stated that the defendant's statement was taken on November 11, if that was the date reflected on the statement, and that he had no recollection of what the defendant told them during the November 10 interview. He did not recall if he and Sergeant Murray told the defendant about the tipster who had provided information about the crime but said if they did so, it would not have been until after the defendant had signed the waiver of rights.

Sergeant Vivian Murray testified that her investigation led her to develop four suspects: the defendant, Sumerall, Wilson, and Selmon. One of the other suspects told her that the defendant, a U-Haul employee, had set up the robbery. She was not certain if the defendant came to the robbery office on his own or whether she sent police officers to bring him in. Regardless, she asked him when he got to her office if he knew why he was there. He indicated that he did not, and she told him that before she could explain, she had to first advise him of his Miranda rights. She advised him of his rights, and he agreed to waive his rights and speak with her about the crime. He then gave a statement admitting his involvement in the robbery. She did not ask him anything about the robbery until after he had waived his rights and agreed to speak to her about it. Sergeant Murray identified the defendant's statement, which was dated November 11, 2003.

Upon reviewing her affidavit of complaint, Sergeant Murray acknowledged that the defendant was brought to the robbery office by police officers. She conceded that he was not free to leave, but said that he was only "formally detained" at that time and was not placed under arrest until after he had given his statement. She had no memory of testifying at the preliminary hearing that she did not advise him of his rights until after she asked him whether he participated in the robbery and he told her he had. After reviewing her preliminary hearing testimony, she explained that she might have been confused by defense counsel's questions at that hearing:

A. As confusing as that sounds, I mean, I may have been confused when you asked me the question. I follow the same protocol with everyone. Before I even discuss a case with anybody, you're going to be advised of your Miranda rights before I even discuss a case with you. Every time, for seventeen years.

Q. But, on this particular day you testified that you didn't?

A. That sounds very confusing.

Q. That does?

A. It does, it sounds very confusing. I know that when [the defendant] was brought into our office, before I even spoke with him about any details of that case, I do the same thing every time. Ask him if he is aware of why he is there. If the answer is no, before I can discuss the case with you, let me advise you of your Miranda rights.

Sergeant Murray testified that the protocol she strictly followed was to advise a suspect of his rights prior to initiating any questioning, and she was certain she advised the defendant of his rights before questioning him. When asked whether her testimony with respect to the procedure she followed in the defendant's case was based on her standard protocol rather than any specific memory, she replied:

A little of both. Like I say, I don't remember specific details, every little detail about this case, but I do remember this case. I do remember [the defendant] coming into the office. I do remember advising him of his Miranda rights. I do remember taking a statement from [the defendant]. I mean, I remember certain details of the case, but I can't remember every specific detail of the case.

Sergeant Murray acknowledged that her memory would have been better at the preliminary hearing, held approximately two months after the defendant's statement was taken, than at the suppression hearing held thirty-one months later. Upon further questioning, she stated that she remembered advising the defendant of his rights, "prior to even discussing the case with him." She advised the defendant of his rights and obtained his written waiver before talking to him on November 10 and re-advised him of his rights and obtained the second waiver before interviewing him the following day. Sergeant Murray said that the defendant was advised of his rights at 9:51 a.m. and gave his statement at 1:20 p.m. In the interim, the defendant was offered food and drink but declined.

The defendant testified that he was picked up by police officers and brought to the robbery office. He said that Sergeant Murray asked if he knew why he was there, and when he replied that he did not, she told him that she had received a Crime Stoppers tip implicating him in the crimes. He stated that he told her he did not have anything to do with the crimes, and she placed Sean Sumerall's statement on the table for him to read. After he had read the statement, she again asked him about his involvement, and he confessed his role in the crimes, telling her what had happened. She then passed him a paper and told him to sign it. She did not read the paper to him, and he did "[n]ot really" read it either. On cross-examination, he admitted that he knew how to read and write and testified that he voluntarily gave the statement.

On July 24, 2006, the trial court entered an order denying the defendant's motion to suppress, noting that both officers had testified at the suppression hearing that the defendant "knowingly and willingly" spoke to the police after being advised of his <u>Miranda</u> rights.

## Trial

Derrick Wheatley testified that he was the manager of the U-Haul store located on Shelby Drive in Memphis. The defendant was employed at the store as a customer service representative in October 2003 and, on the day of the robbery, asked for permission to leave early. He consented, and the defendant left the store at about 7:30 p.m. Ten to fifteen minutes later, as Wheatley was counting the cash drawer while his friend, Cori Martin, was waiting for him in the store, two men entered, walked to the front counter, and began asking about boxes. One man, whom Wheatley later learned was Wilson, then laid a gun on the counter, told him that he was robbing him, and demanded all the money.

Wheatley testified that he told the gunman that the money had already been deposited. In response, the gunman called him a liar, jumped across the counter, hit him in the head with the gun, and demanded that he open the safe. He told the gunman that he did not have the keys to the safe, and the gunman hit him in the head with the gun again. At that point, he told the men where the money was located, and the second man took the money "from under the till." The men then ordered him and Martin into a storage closet, where they demanded the store's surveillance tape. The second man took the tape, and the men instructed Wheatley and Martin to lie on the floor and be still. When they heard the men leave the store, he and Martin got up and called the police.

Wheatley testified that the store's surveillance cameras were only two to three inches in size and the same color as the store's walls. Therefore, while visible to someone who was looking for them, they were not readily obvious to the average person. He said that the store safe was located out of sight behind the front counter, but the men appeared to be familiar with its location. He stated that the men took approximately $3,000 to $4,000 in cash from the store, his wallet, and Martin's wallet and cell phone. On cross-examination, he acknowledged that he had pled guilty to theft of property over $500 in 2001.

Cori Martin testified that he was talking on his cell phone and Wheatley was counting the store's money when two men entered the store. Wheatley shut the cash drawer, and the men walked to the counter, displayed a gun, and demanded money. Martin said that he told the person he was

talking to that they were being robbed and ended the call. One of the robbers approached him and took his cell phone and money, while the second one, who had been repeatedly demanding money from Wheatley, jumped over the counter, hit Wheatley in the head with the gun, and began demanding that Wheatley take him to the safe. The cash register was opened at some point, and one of the men took the money out of it. Next, the men ordered Martin and Wheatley into the back, removed the store's surveillance tape, forced him and Wheatley to lie down, instructed them not to move, and then ran out. Martin estimated that the men took approximately $200-$300 from him during the robbery.

Sean Sumerall testified that he had been charged in the case and was awaiting trial but that the State had not promised him anything in exchange for his testimony. He said that the defendant called him on October 10, 2003, to ask if he needed money and to suggest that he rob the U-Haul store where the defendant was employed. The defendant called him back to tell him that he had arranged for someone else to commit the robbery but that those individuals would not arrive in time. The defendant then picked Sumerall up at his home and dropped him off around the corner from the store. By the time Sumerall reached the store, however, the police were already on the scene. Sumerall said that he was apprehended by police and taken into the store, where the victim told the officers that he was not one of the men who robbed the store. He was later questioned by robbery detectives and gave a statement consistent with his trial testimony. Sumerall acknowledged that he had two prior convictions for theft.

Officer A. Henderson of the Memphis Police Department, the patrol officer who responded to the scene, identified various photographs of the crime scene, which were admitted as trial exhibits.

Sergeant Vivian Murray essentially repeated her suppression hearing testimony, describing her investigation of the robbery, what led her to develop the defendant as a suspect, and her interviews with him following the execution of his written waivers. She identified the defendant's statement, which was subsequently admitted as an exhibit. The statement reads in pertinent part:

> The day before the robbery, I was over my daughter's house [sic] and I saw Leon and June Baby. We were standing outside talking and they asked me about robbing the U-Haul where I worked at. I told them what days a large sum of money would be in the store. The next day, I went to work and later that day, my boss let me go home early. I called Sean Su[]merall, a friend of mine, and told him today would be a good day to rob the U-Haul store and to come on. For some reason, the conversation with Sean didn't feel right, so that's [sic] I told Sean I would call him back and I called June Baby. I asked if they still wanted to go ahead with the robbery and tonight would be a good night. June Baby said o.k. and hung up. A little while later, I started feeling as if I didn't want to rob the U-Haul and I tried to call June Baby to call it off but I couldn't get in touch with him. I called Sean back around 7:30 pm, and he said he would do the robbery, so I went and picked him up. I told Sean that I had already called June Baby to do the robbery but I would try and get him there first. I dropped Sean off at a gas station down the street from U-Haul, and I came back through about 5 minutes later. That's when I saw the police there and

I called [Wheatley] to see what had happened. About an hour later, Sean called me to come pick him up and I went and got him. Sean said he didn't get a chance to do the robbery because it had already happened. Later that night, I went over to the apartments where we hang out at, and June [B]aby and Leon said they robbed the U-Haul. One of them said they hit [Wheatley] the gun [sic]. I asked them how much money they got and they said about $1500 or $1600 dollars. They offered me some of the money but I told them I didn't want it. Then they went their way and I went home.

Sergeant Murray testified that after the defendant confessed, Wilson and Selmon each gave a statement implicating themselves and the defendant in the robbery. On cross-examination, she testified that she did not use audio or video recording equipment during her interviews with the defendant. She said that she had attended the "Reed interrogation school" and acknowledged that it involved a "psychological approach to how to break people down."

Sergeant Michael Brown also essentially repeated his suppression hearing testimony. On cross-examination, he testified that the defendant denied any involvement in the robbery during their first interview on November 10. He said the defendant was placed on a forty-eight-hour investigative hold and interviewed again the next day after he had been re-advised of his rights and had signed another waiver. At that time, the defendant admitted he had planned the robbery and gave the statement detailing his role in the crimes.

The defendant elected not to testify and rested his case without presenting any proof.

## ANALYSIS

### I. Denial of Motion to Suppress

The defendant first contends that the trial court erred in denying his motion to suppress his statement. Essentially, he argues that the trial court should have found Sergeant Murray's testimony at the preliminary hearing, where she said she asked the defendant about his participation in the crimes prior to advising him of his Miranda rights, more credible than her testimony at the suppression hearing, where she testified that she advised the defendant of his rights and obtained his written waiver before asking him any questions. He points out that the general sessions court suppressed his statement on the basis of Sergeant Murray's preliminary hearing testimony and that Sergeant Murray herself admitted at the suppression hearing that her memory would have been better at the preliminary hearing than at the later suppression hearing. The defendant further argues that the "illegally obtained initial confession" tainted the subsequent confession, asserting that "[a]fter being arrested and giving the unwarned confession, the defendant was kept in police custody for 26 hours and . . . interrogated numbers of time[s] before he gave the written statement some 26 hours later."

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d

18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Testimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)).

Sergeant Murray testified repeatedly, both at the suppression hearing and at trial, that she read the defendant his rights and obtained his waiver of those rights before asking him any questions about the robbery. She also explained her preliminary hearing testimony by stating that she must have been confused by counsel's questions at that hearing. Sergeant Brown corroborated her account, unequivocally testifying that neither he nor Sergeant Murray talked to the defendant about the robbery until after he had been informed of his rights and agreed to waive those rights. In denying the motion to suppress, the trial court accredited the officers' suppression hearing testimony on the issue, as was within its province. See Odom, 928 S.W.2d at 23.

Furthermore, the record does not support the defendant's assertion that he made more than one statement in connection with this case or that he was interviewed "numbers of time[s]" during the 26 hours he spent on investigative hold. Only one statement was admitted into evidence at the suppression hearing and at trial, and Sergeant Brown testified that the defendant denied any involvement in the crimes during their first, November 10, interview. The defendant was brought back into the robbery office the next morning, re-advised of his rights, interviewed again, and gave the statement. We conclude, therefore, that the trial court did not err in denying the motion to suppress the statement.

## II. Sufficiency of the Evidence

The defendant next challenges the sufficiency of the convicting evidence. Specifically, he argues that the evidence tying him to the crimes was insufficient because the State failed to establish that the men he referred to in his statement as "Leon" and "June Baby" were the same individuals who either robbed or attempted to rob the U-Haul store. Presumably, he is challenging only the convictions for the offenses for which he was indicted with Selmon and Wilson. The State responds

by arguing that the defendant has waived the issue by his failure to cite to any supporting authority. In the alternative, the State argues that the evidence, which included Sergeant Murray's testimony that Selmon and Wilson each implicated the defendant in the crimes in their respective confessions, was sufficient to sustain the defendant's convictions.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear and accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1) (2006). Conspiracy is committed if

> two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Id. § 39-12-103(a). Finally, a person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the persons solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2).

The evidence, viewed in the light most favorable to the State, was sufficient to sustain the defendant's convictions for conspiracy to commit aggravated robbery and aggravated robbery. Both victims described an aggravated robbery, testifying that one of the two men who entered the U-Haul store on October 10, 2003, displayed a gun, which he used to strike Wheatley in the head as the robbers took the victims' and the store's money. Wheatley further testified that he later learned that the gunman, whom he had not known prior to the robbery, was Wilson. In his statement to police, the defendant confessed that he had separately arranged for both Sumerall and two men he knew as "June Baby" and "Leon" to rob the store on that particular date and time; that he dropped Sumerall off near the store after telling him that he had already arranged for "June Baby" to commit the robbery but would try to get Sumerall there first; that Sumerall told him that the robbery had already been committed by the time he arrived at the store; and that "June Baby" and "Leon" told him later that night they had committed the robbery and that Wheatley was struck in the head with a gun during its commission. Sumerall corroborated the defendant's statement, testifying that the defendant dropped him off near the store after telling him that he feared the other individuals with whom he had planned the robbery would arrive too late but that, when he arrived at the store, the robbery had already been committed. Finally, Sergeant Murray testified that Wilson and Selmon each gave statements confessing their roles in the robbery and implicating the defendant in the crimes. We conclude that this evidence was sufficient for a rational jury to find the defendant guilty of conspiracy to commit aggravated robbery and two counts of aggravated robbery beyond a reasonable doubt.

### III. Limitation of Cross-Examination of Witness

As his final issue, the defendant contends that the trial court committed reversible error by limiting his cross-examination of Sergeant Murray with respect to the "Reed technique." The defendant argues that he should have been allowed to continue his line of questioning in order "to show to the jury that the techniques . . . used by the police to obtain a confession" could lead to a false confession. The State argues, alternatively, that the defendant has waived this issue by his failure to cite any authority in support of his argument and that the trial court acted within its discretion in excluding the line of questioning, which was both irrelevant and argumentative. We agree with the State.

A defendant's constitutional right to confront witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987); State v. Brown, 29 S.W.3d 427, 431 (Tenn. 2000). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citations omitted). This court will not, therefore, disturb a trial court's limits on cross-examination unless we find that the court has placed unreasonable restrictions on that right. State v. Wyrick, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001); Dishman, 915 S.W.2d at 463.

The record reveals that after defense counsel had questioned Sergeant Murray at some length about her interview procedure, including the fact that she had neither tape-recorded nor videotaped the interviews, the following exchange occurred:

[Defense Counsel]: So you don't keep a record of how you approached people or talked to people or discuss – or what you discuss in the interview room[?] Is that correct?

[Sergeant Murray]: What do you mean by a record of my approach? I just begin talking to him.

[Defense Counsel]: Okay. Do you have – are you taught how to interview and interrogate people?

[Sergeant Murray]: Yes, sir.

[Defense Counsel]: Do you go to classes for that purpose?

[Sergeant Murray]: You can but not all investigators go to interview and interrogation[] schools.

[Defense Counsel]: Have you?

[Sergeant Murray]: I have been to Reed interrogation school.

[Defense Counsel]: Reed?

[Sergeant Murray]: Uh-huh.

[Defense Counsel]: That's the Reed technique, isn't it? It's a psychological approach to how to break down people. Is that not correct?

[Sergeant Murray]: Yes, pretty much.

[Defense Counsel]: Pretty much. And one way is to isolate them, isn't it?

[Sergeant Murray]: To isolate them?

[Defense Counsel]: Right. Isn't that one of the things you all are learned to do? Put them in a room without any windows?

[Sergeant Murray]: No, sir, that's not what we were taught to do.

[Defense Counsel]: That's not part of the Reed technique?

[Sergeant Murray]: Sir, I couldn't –

The prosecutor objected at that point, and the trial court sustained without specifying its reasons. We agree with the State, however, that the trial court's limitation of the cross-examination

-10-

was proper. The trial court afforded defense counsel wide latitude in his cross-examination of Sergeant Murray with respect to her specific interrogation of the defendant and the differences between her preliminary hearing testimony and her testimony at the suppression hearing and at trial. General testimony about the "Reed technique" was not relevant to whether the defendant was properly Mirandized or whether his statement was knowing and voluntary. Accordingly, we conclude that the trial court did not err in its ruling on this issue.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE